UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:12-CV-114-KSF

APPALACHIAN REGIONAL HEALTHCARE, et al.                      PLAINTIFF

vs.                         **OPINION AND ORDER**

COVENTRY HEALTH AND LIFE
INSURANCE COMPANY, et al.                                    DEFENDANTS

* * * * * * * *

This matter is before the Court on the motion of Appalachian Regional Healthcare, Inc. and ARH Mary Breckinridge Health Services, Inc. (collectively "ARH") for a preliminary injunction relating to Medicaid services in Kentucky's Regions 7 and 8.  The parties were heard in person on May 4 and May 31, 2012; by telephone on several occasions; and through status reports and briefing.  An evidentiary hearing was held on June 12, 2012.  For the reasons discussed below, the motion will be granted in part.

I.      **BACKGROUND**

The essential facts in this case are not in dispute.  Prior to November 2011, the Cabinet for Health and Family Services ("Cabinet") administered Kentucky's Medicaid program by directly reimbursing health care providers for the services they provided to Medicaid recipients under what was known as a fee-for-services basis.  In September 2011, Kentucky obtained a waiver from the federal Centers for Medicare and Medicaid Services ("CMS") to change to a mandatory managed care program.  Effective November 1, 2011, Kentucky implemented its managed care program for virtually all of its Medicaid recipients in the state, except those residing in the service area covered by Passport Health Plan. Cabinet Ex. 6.[1]  Under the managed care program, health services for

---

[1]  All exhibits are from the June 12 evidentiary hearing unless stated otherwise.

Medicaid recipients are managed by health managed care organizations or insurance companies ("MCOs"), which receive from the Cabinet a flat monthly fee ("capitated payment") for each Medicaid recipient in its group ("member"), whether any health services are provided for that member or not. DE 65, Cabinet ¶ 3; Tr. 74:16-24.[2]  The Cabinet awarded MCO contracts to three companies,  Coventry Health and Life Ins. Co. ("Coventry"), Kentucky Spirit Health Plan, Inc. ("Kentucky Spirit"), and Wellcare of Kentucky, Inc. ("Wellcare"). Cabinet Ex. 6.  Coventry and Wellcare included ARH hospitals and physicians in their networks, but Kentucky Spirit did not. Tr. 29:16-24.  Medicaid recipients were initially automatically assigned to one of the three MCOs by the Cabinet, but the recipients could change their MCO during an initial  ninety-day open enrollment period. Tr. 32 :20-24.  Except during annual open enrollment periods, any request to change MCOs must be for "cause."

Each MCO contracted with health care providers to deliver health care services to its members in exchange for payment by the MCO at a percentage of the Medicaid rate agreed upon in the contract between the MCO and the provider.  The group of contractual health care providers are referred to as the MCO's "network."   Each MCO is required by the terms of the MCO Agreement with the Cabinet and certain state and federal regulations to have a network of health care providers that assures certain of its covered services are accessible to members within specific times and distances from their residences. DE 65, Coventry ¶ 5.  For the rural Medicaid Region 8, the MCO must provide hospital care within a driving distance of not more than 60 minutes. Coventry Ex. 2, p. 117, ¶ D.

On October 5, 2011, Coventry entered into a Letter of Agreement ("LOA") with ARH that contemplated further negotiations toward a long-term, full participation agreement. DE 24-5.  Amendment #1 to the LOA provided that it would remain effective until execution of the participation agreement or June 30, 2012.  If no participation agreement was executed by June 30, 2012, the

---

[2]  The transcript of the June 12, 2012 Hearing is referenced herein as "Tr."

2

LOA was to "continue for the period of time mutually agreed to in writing by the parties." *Id.* The parties have not been able to reach agreement on a long-term contact. DE 65, Coventry ¶ 9.

On March 28, 2012, Coventry notified ARH that it was terminating the LOA effective May 4, 2012, and that any new contract would require lower reimbursement rates for ARH. DE 8-8, p. 2, ¶ 5. On April 16, 2012, ARH filed the present lawsuit against Coventry and the Cabinet. DE 1.

On April 19, 2012, Timothy Nolan, Executive vice President of Coventry, wrote ARH's President, Jerry Haynes, advising that Coventry would no longer authorize its members to be treated by ARH. DE 8-8, ¶ 7; DE 8-3. Mr. Nolan said that "Coventry was explicitly told that ARH was essential to meet the Commonwealth's network adequacy standards...." DE 8-3, p. 1. Mr. Nolan blamed the Cabinet for "the current crisis," because it did not require Kentucky Spirit to include ARH, which "resulted in an unprecedented movement by higher-risk members from the other MCO to Coventry." *Id.* Coventry claimed the Cabinet failed "to ensure that all MCOs meet the same robust standards for network adequacy," failed "to implement a risk adjustment methodology" to compensate MCOs for the higher-risk members in Regions 7 and 8, and failed "to find a solution to the supplemental hospital payment issue and errors in the original data book." *Id.* at 2. As a result, Coventry complained that its "Kentucky plan is deeply in the red and losing millions of dollars each month." *Id.*

On May 1, 2012, ARH moved for a preliminary injunction and expedited hearing. DE 8. The next day, the Cabinet responded that it had informed Coventry that Coventry must provide its members with a thirty-day written notice of termination of the LOA with ARH prior to any actual termination. DE 22. Following a hearing on May 4, 2012, the parties submitted an Agreed Order extending the term of the LOA through the close of business June 30, 2012, agreeing to continue negotiations with weekly status reports to the Court, and agreeing that the Court would be advised if there was an impasse so it could ensure there is a process in place to grant members adequate notice of the termination of ARH as a provider in the Coventry network. DE 28.

On May 25, 2012, Coventry advised that the differences between ARH and Coventry could not be bridged and that the Cabinet would not approve Coventry's draft letter to its members regarding the termination of ARH. DE 38.  The Cabinet responded that Coventry's draft letter "did not contain any information related to the ability of the member to change MCOs" and that it had revised the letter to include that information. DE 41.

 At a hearing on May 31, 2012, ARH objected to the revised Coventry letter as not giving adequate notice and education to the Coventry members so they could make an informed choice regarding changing MCOs or providers.[3] DR at 2-4.   ARH characterized the letter as a "marketing letter" from Coventry and suggested any letter be sent by the Cabinet. *Id.*  ARH wanted an opportunity to contact the Coventry members itself, but had no way of knowing who they are. *Id.* at 7-8.  Coventry declined to provide a list of its members. *Id.* at 8.  Regarding the adequacy of Coventry's network without ARH, the Cabinet said "we have a map that shows that both Coventry and Kentucky Spirit meet the minimum requirements for adequacy in their network, minimum, but they meet it." *Id.* at 9.  The Court interpreted this comment to mean "barely adequate." *Id.* at 10-11. ARH objected to the Cabinet maps with 45-mile radii around non-ARH hospitals and also noted that the maps failed to consider the available services at each hospital. *Id.* at 11-14.  The Court scheduled a hearing for June 1, 2012 on the adequacy of Coventry's network without ARH as a provider.  Coventry moved for a continuance. DE 47.  Following conference calls with the parties, the evidentiary hearing was rescheduled for June 12, 2012.

Late on June 8, 2012, Coventry challenged the standing of ARH to question the adequacy of Coventry's network. DE 51.  On June 11, the Cabinet moved for summary judgment on grounds of sovereign immunity, ARH's claimed lack of standing to question Coventry's network, and ARH's

---

[3]  The parties did not request a transcript from this hearing; accordingly, no final transcript has been prepared.  The Court is citing to a draft, referenced as "DR".

claimed failure to exhaust administrative remedies. DE 57.  No other briefs have been filed on these issues, and a decision on these challenges must await further briefing.

At the June 12 hearing, Coventry committed to maintain ARH as an available, preauthorized out-of-network provider[4] through the open enrollment period in November 2012. Tr. 100.  Coventry also committed to paying ARH at the LOA rates for care under the continuation of care provisions of the LOA.  The Court's factual findings and conclusions of law are set forth below.

## II.    ANALYSIS

### A.    Requirements for Preliminary Injunction

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network, L.L.C., v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Four factors must be balanced: (1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief. *International Dairy Foods Ass'n v. Boggs,* 622 F.3d 628, 635 (6th Cir. 2010).  "The degree of proof necessary for each factor depends on the strength of the Plaintiffs' case on the other factors." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996).

### B.    Findings of Fact

1.    Medicaid is a cooperative federal-state program that provides medical care to needy individuals. To qualify for federal funds, a State must submit its requests for waivers of certain Medicaid requirements to the federal agency that administers the program, the Centers for Medicare & Medicaid Services (CMS). 42 U.S.C. § 1396u-2.

_____

[4]  As an out-of-network provider, ARH would be paid at lower rates. DE 24-5; Tr. 52, 100.

2.     The Medicaid Act commits to CMS the power to administer the program, including enforcement of its requirements. 42 U.S.C. § 1316(a)(1).

3.     The Cabinet for Health and Family Services is to comply with any requirement that may be imposed, or opportunity presented, by federal law for the provision of medical assistance to Kentucky's indigent citizenry. KRS 205.520(3).

4.     Disputes that pertain to whether a State's practice under a waiver meet Federal requirements are subject to the hearing provisions of 42 C.F.R.430 Subpart D. 42 C.F.R. § 430.3.

5.     There are over 560,000 persons in the managed care program in Kentucky. Tr.  48.

6.     Kentucky Medicaid Managed Care Organization Region 8 consists of nineteen counties in eastern and southeastern Kentucky. These counties are Bell, Breathitt, Clay, Floyd, Harlan, Johnson, Knott, Knox, Laurel, Lee, Leslie, Letcher, Magoffin, Martin, Owsley, Perry, Pike, Whitley, and Wolfe. DE 64, p. 2, ¶ B. (2), Cabinet.

7.     ARH is a non-profit healthcare provider that operates eight hospitals in eastern Kentucky, along with home health services, durable medical equipment stores, physician office clinics, and retail pharmacies.  It operates two additional hospitals and related services in southwest West Virginia. Tr. 12-13; Exs. 1, 2.  ARH and its physicians have been caring for the eastern Kentucky population for more than fifty hears.

8.     ARH's hospitals in Harlan, Hazard, Middlesboro, Whitesburg, and Williamson are full-service hospitals providing obstetrical services and deliveries in addition to other specialty services. The Hazard hospital also provides significant cardiology and oncology services. Tr. 14.

9.     ARH employs nearly 5,000 people, including 100 physicians. *Id.*

10.     Coventry Health Care, Inc. is a national insurance company based on Bethesda, Maryland. http://coventryil.coventryhealthcare.com/about-us/index.htm  Its subsidiary, Coventry Health and Life Insurance Company ("Coventry"), began operating an MCO in Kentucky on November 1, 2011. Coventry Ex. 2; Tr. 108:17-19.

11.     On October 5, 2011, Coventry entered into a Letter of Agreement with ARH and agreed to pay certain fees for ARH's provision of health care services to Coventry members. DE 24-5, Tr. 108:25, 109:1-2.

12.     Coventry has approximately 64,000 Medicaid members in Region 8. Tr. 110:2-6.

13.     Negotiations for a long-term full participation agreement between ARH and Coventry did not succeed, and Coventry gave notice to ARH of the termination of the LOA on March 28, 2012. Tr. 109:3-7; DE 8-8.

14.     On April 10, 2012, Michael Murphy, Coventry's Kentucky CEO, wrote Governor Steven L. Beshear advising him that "three policy decisions are urgently required to avoid potentially irreparable harm to the [Medicaid managed care] program." DE 24, Ex. D.  The policy issues of concern to Mr. Murphy were (1) a fair risk adjustment between the MCOs; (2) supplemental hospital payments; and (3) network adequacy.  Mr. Murphy advised the Governor as follows:

> CHFS must reevaluate the network adequacy of Kentucky Spirit (in regions 7 and 8) to ensure that its network is no less robust than the networks required of other MCOs. Further, CHFS must communicate the results of these evaluations to all MCOs. If Kentucky Spirit's network is found to be inadequate, we believe the Commonwealth must take immediate action to ensure that plan enrollees have adequate access to providers, even if this means canceling the contract with Kentucky Spirit. We believe this analysis should take place as soon as possible, as it is our concern that this uneven playing field has resulted in an unprecedented shift of higher-risk members to Coventry that cannot be fully mitigated through risk adjustment. We recognize the seriousness of this charge, but CHFS policy has effectively allowed Kentucky Spirit to "game the system" and granted them an unfair advantage.

*Id.*

15.     After ARH filed this lawsuit, Timothy Nolan, an Executive Vice President at Coventry, wrote ARH's CEO, Jerry Haynes on April 19, 2012:

> Coventry made every effort to develop an adequate provider network in all regions, as required per the Commonwealth's RFP. Coventry was explicitly told that ARH was essential to meet the Commonwealth's network adequacy standards …

DE 5, ARH Amended Complaint, Ex. B.  Mr. Nolan went on to explain that Coventry had subsequently learned that the Commonwealth had held Kentucky Spirit to a different standard by

allowing it to exclude ARH from its network.  According to Mr. Nolan, "This disparity resulted in an unprecedented movement by higher-risk members from the other MCO to Coventry."[5] *Id*.

16.     Mr. Nolan continued to explain that the "current crisis" between Coventry and ARH would not have occurred except for the Commonwealth's failure to make timely and reasonable decisions on the three issues Mr. Murphy had raised in his letter to the Governor. *Id.*

17.     Mr. Nolan also apprised Mr. Haynes that with the termination of the LOA, Coventry "will not authorize any treatment or services for our members at your facilities and therefore no issue exists as to what your reimbursement should be. With respect to those limited circumstances where we are required to authorize treatment, such as emergency services, family planning and foster care, Coventry will reimburse you at the federally mandated rate of 100% of the Medicaid fee schedule." *Id*.

18.     On May 4, 2012, the parties entered into the Agreed Order extending the terms of the LOA through June 30, 2012.  The Cabinet also agreed in that order that the "Cabinet shall deem any termination of the Coventry-ARH LOA to be for a 'for cause' basis to transfer members to another managed care organization in an expedited manner, and in accordance with the member's choice." DE 28.

19.     According to federal regulations, a MCO must maintain and monitor a network of appropriate providers that is supported by written agreements and is sufficient to provide adequate access to all services covered under the contract considering (1) the expected utilization of services, taking into consideration the characteristics and health care needs of specific Medicaid populations represented in the particular MCO; (2) the numbers and types (in terms of training, experience, and specialization) of providers required to furnish the contracted Medicaid services; and (3) the geographic location of providers and Medicaid enrollees, considering distance, travel

---

[5]  In November and December of 2011, 10,830 Medicaid enrollees who were ARH patients exercised their rights to change MCOs under the Open Enrollment period. Of those enrollees 7,097 switched to Coventry. ARH Ex. 13; Tr. 68:18-69:2.

time, and the means of transportation ordinarily used by Medicaid enrollees. 42 C.F.R. 438,
206(b)(1)(ii) (iii) & (v).

20.     The documentation must show that the MCO maintains a network of providers that is
sufficient in number, mix, and geographic distribution to meet the needs of the anticipated number
of enrollees in the service area. 42 C.F.R. 438, 207(a)(b)(2).

21.     In addition, the MCO must meet State standards for timely access to care and services,
taking into account the urgency of the need for services. 42 C.F.R 438, 206(c)(1)(i).

22.     The Cabinet's regulation requires that the MCO shall provide hospital care for which
transport time, under normal driving conditions with no extenuating circumstances, shall not exceed
sixty minutes from an enrollee's residence. 907 KAR 17:005, Sections 1(87) & 15(7)(b).  Section
28.7 of Coventry's contract with the Cabinet includes the access standards.  Coventry Ex. 2; Tr.
106-107, 120, 181.

23.     The Cabinet's regulation also requires that MCOs shall make primary care delivery sites
available that are no more than 45 minutes/45 miles from Members' residences. 907 KAR 17:005;
Section 15(3)(a).

24.     The 60-minute rural and 45 mile/minute access requirements, as well as a requirement to
comply with all relevant state and federal laws and regulations, are incorporated into Coventry's
MCO Agreement with the Commonwealth of Kentucky. See Coventry Ex. 2. They are also
incorporated into Paragraph 9 of the LOA between Coventry and ARH.

25.     The LOA between Coventry and ARH has a clause providing as follows:

> 14. Continuation of Benefits. Upon termination of the LOA for any
> reason other than quality of care issues or fraud, and if a
> Participation Agreement is not immediately entered into between the
> parties, Provider shall continue to provide Covered Services to
> Members who are receiving treatment at the time of termination or
> who are hospitalized on the date the LOA terminates or expires, until
> the course of treatment is completed or through the date of each
> such Member's discharge from an inpatient facility, whichever is
> longer, and in the case of a pregnant woman, services shall continue
> to be provided through the end of the post-partum period if the

9

> pregnant woman is in her fourth or later month of pregnancy at the time of termination. Such continuation of services shall be made in accordance with the terms and conditions of the LOA as it may be amended and in effect at the time, including but not limited to the compensation rates and terms set forth therein. This Section shall survive termination of the LOA. Coventry shall reimburse Provider in accordance with this LOA for all said services.

LOA, DE 24, Ex. E.

26.     Tens of thousands of Medicaid patients in Kentucky Medicaid Region 8 rely on ARH providers and facilities for care. ARH Ex. 14; Tr. 69:18-25; ARH Ex. 9, Tr. 60:9-25; ARH Ex. 7; Tr. 57:12-15.

27.     In addition to ARH's five full-service hospitals in Region 8, all of which provide obstetric care, ARH operates physician clinics throughout the region. ARH Ex. 2; Tr. 14:1-7, 11-14; Tr. 20-23-24.  ARH also operates home health services, durable medical equipment stores, and retail pharmacies. Tr. 12:24-13:1.  In some counties, it is the only home health agency that has a certificate of need allowing it to provide services to patients. Tr. 14:1-5.

28.     Coventry has contracted with eleven non-ARH hospitals in Region 8.[6]  Three of these hospitals are "critical access" hospitals, which have 25 beds or less and limited services.  ARH Ex. 3; Tr. 50:12-18.  Two others, Pineville Community Hospital in Bell County and Kentucky River Medical Center in Breathitt County, lack important services, such as obstetric care. ARH Ex. 3; Tr. 16:12-18:2, 67:5-8; 86:22-25.

29.     From January 1 through April 30, 2012, some 15,862 Coventry members accessed services provided by ARH facilities or physicians.  ARH Ex. 14; Tr. 70-7.  These do not include Coventry members who have not needed services during this time, but who may need to access an ARH facility or provider in the future. Tr. 71:8-11.

---

[6]  Coventry issued a notice of intent to terminate its contracts with Baptist Regional Medical Center in Corbin, Kentucky, which is a full-service hospital. Tr. 134:8-20.  Coventry also issued notices of intent to terminate its contracts with King's Daughters Medical Center in Ashland, Kentucky, and a hospital in Medicaid Region 4. Tr. 134:21-135:25.

30.    Without ARH, significant numbers of patients in communities throughout Region 8 will be forced to drive more than 60 minutes from their homes in order to reach a hospital in Coventry's network. Tr. 23:13-28:21; ARH Ex. 5; ARH Ex. 6; ARH Ex. 11; ARH Ex. 12.  This is especially true of obstetric patients.

31.    ARH submitted numerous MapQuest calculations, which calculate driving time based on distances and posted speed limits, showing that Coventry patients in many communities will be unable to reach a non-ARH hospital within 60 minutes of driving time if they are able to drive the posted speed limits for their entire trip. ARH Ex. 5; ARH Ex. 11; ARH Ex. 12.

32.     Mr. Haynes testified that he has "personally driven most of these roads hundreds and thousands of times, so I can pretty accurately indicate that these times are – seem to be accurate." Tr. 42:3-5.

33.    The Court is also personally familiar with drive times from various communities in eastern Kentucky, having practiced law in the area for many years and having been the resident federal judge in Pikeville for two years.  The Court will take judicial notice of roads, road maps, distances, and posted speed limits and finds that the driving times calculated by Coventry's methodology, relying on GeoAccess, were grossly incorrect and entitled to no weight. Tr. 148:20-23.

34.    ARH submitted 17 affidavits from Coventry patients who describe the difficulties they would face because of increased travel times to non-ARH hospitals.  Many patients in the region lack reliable transportation, money for gas, or are too sick to travel any farther than they have to. ARH Ex. 15.

35.     ARH has also submitted affidavits from ARH doctors who fear for their patients' health if those patients are forced to switch to non-ARH providers. Many doctors worry that their patients will not seek care as often as they should if forced to travel longer distances for a doctor visit, which will harm patients' health. ARH Ex. 16.

36.     One woman provided her affidavit describing her numerous health issues and that she takes twenty-one medications a day.  It is not uncommon for her to be admitted to the hospital for treatment.  The Hazard ARH is a ten- to fifteen-minute drive from her house.  The Pikeville hospital is more than a two-hour drive from her home.  Her health will not permit her to travel over two hours to obtain medical care.  She cannot afford to travel to Pikeville for medical care.  She contacted the Department of Medicaid Services in April 2012 requesting that she be changed to Wellcare, but was told her reasons were not good enough.  She contacted Coventry four or five times in the last month and left messages explaining her concerns about the June deadline, but no one from Coventry has returned her calls.  ARH Ex. 18

37.     Without ARH, a total of twelve contiguous counties in Region 8, plus Martin County in Region 7, lack a hospital in Coventry's network having obstetric services. ARH Ex. 4; Tr. 19:1-4. This is an enormous geographic hole in the network.

38.     Even if Memorial Hospital in Manchester is in Coventry's network as it claims, that hospital provided only seven deliveries for Coventry members from November 2011 to May 2012 and does not close the gaping geographic hole. Coventry Ex. 7.

39.     Many obstetric patients in these areas, particularly in Perry, Leslie, Letcher, and Harlan Counties, and parts of Bell County, will be forced to drive more than 60 minutes to a hospital. Tr. 20:10-15; Tr. 85:11-86:6.

40.     Regular prenatal care is particularly important among Medicaid patients in Region 8. Dr. Nathan Mullins, an obstetrician who practices in Middlesboro, Kentucky, testified that pregnant mothers generally need to attend weekly appointments for uncomplicated pregnancies. However, many of Dr. Mullins' patients in Region 8 have complications that require more frequent visits, such as diabetes, high blood pressure, or growth-restricted fetuses. Dr. Mullins testified that 50 percent of his pregnant patients are smokers, and that he has had multiple patients who use marijuana or pain prescription opiates while pregnant. Dr. Mullins testified that frequent visits with these patients

allow him to monitor the progress of the fetus in order to prevent fetal harm, and also to encourage his patients to stop engaging in behaviors that can pose harm to their unborn children. *See* Tr. 88:18-92:4.

41.     According to Dr. Mullins, lengthy travel threatens the health of these pregnant women and their babies because these patients are less likely to seek pre-natal care if they have to travel longer distances to travel to a doctor or hospital. Tr. 88:14-17. This increases the risk of complications, including the possible death of the fetus. Tr. 89:13-19.

42.     Coventry posted misleading information on its website regarding the distances its members must travel in order to reach providers. Its provider lookup website sets forth distances to providers in "air miles" rather than in the mileage a member would have to drive, thereby making in-network providers appear to be much closer than they are. Tr. 61:13-64:12.  In the real world, its members often must travel narrow, curvy roads, and travel time may well be influenced by weather and atmospheric conditions, complicated by the presence of large coal and lumber truck traffic.

43.     Coventry used a software tool called GeoAccess to assess whether its network of providers would meet federal, state and contractual network adequacy requirements for its Members in Region 8 without ARH. Tr. 109:8-25.

44.     GeoAccess is a product of a company called Optum which is owned by a managed care company. Tr. 110:17; 128:10-12.  GeoAccess was first developed in the early 1990s before the availability of Mapquest. Tr. 147:20-21; 148:9-10.  It is a generic tool that was not developed for a particular region. Tr. 148:24-25.

45.     GeoAccess computes road travel distances between provider zip codes and member zip codes, and computes average travel times for members by applying driving speeds to the road distances between zip codes. Tr. 110:19-111:12; 127:19-24.

46.     Three different driving speeds were used by the GeoAccess software depending on population density: 35 mph for urban, 45 mph for suburban, and 65 mph for rural. Tr. 112:7-10.

Coventry's V.P. of Network Management testified that the speed limits used by GeoAccess cannot be adjusted. Tr. 112:18-20.

47.     The GeoAccess software analysis used by Coventry assumed a travel speed of 65 mph for all roads in Region 8. Tr. 131:5-10.

48.     GeoAccess measures road distances from what the software determines to be the central point of population density in a particular zip code. Tr. 129:20-21.

49.     The software program does not adjust for the fact that eastern Kentucky has some large, sparsely populated zip codes where members might live in an isolated area in the mountains very far from the central point of population density in a particular zip code. Tr. 130:1-10.

50.     Coventry's evidence of network adequacy essentially consisted of various reports generated using GeoAccess software showing average distances and average driving times between the central points of population density of the various zip codes of its members and the central points of population density of the various zip codes of the providers in Coventry's network using a travel speed of 65 mph for all roads in region 8. Tr. 129:20-21; 130:23-131:1-7; 132:6-10.

51.     GeoAccess is a tool designed for assistance in evaluating the adequacy of a network, Tr. 149:25, but Coventry has erroneously used the GeoAccess software as if its assumptions, and the averages it generates, constitute the criterion for determining network adequacy under Kentucky's Medicaid managed care program. *See generally*, Testimony of Kim Sizemore, Tr. 102:22-143:6.

52.     The Court takes judicial notice of the fact that none of the state or county roads or parkways in the counties comprising Region 8 have posted speed limits over 55 mph. See KRS 189.390.

53.     ARH is not the only provider in Region 8 who has received notice from Coventry that Coventry is terminating its contractual relationship with that provider. Tr. 133:16-25.

54.     Coventry's analysis of its network adequacy without ARH did not account for the hospitals and physician providers who recently received such notices, and who may no longer be a part of Coventry's network in the near future. Tr. 133:16-25; 134:1-135:25.

14

55.    Coventry interprets the data it generated using GeoAccess as indicating that 2.1 percent of its members would fall outside of the federal, state and contractual 60 minute travel time requirement for hospital access. Coventry Ex. No. 5.  Assuming Coventry's interpretation of the data to be correct, this would translate as roughly 1344 of Coventry's 64,000 members in Region 8. This assumption is based on the number of patients living in ZIP codes that the GeoAccess software calculates as having an average drive time of more than 40 minutes.

56.    Coventry Exhibit 7 shows that in terms of patient days, obstetrics is the second- highest reason for its members to be admitted to a hospital. Tr. 138:6-12.

57.    Coventry does not formally educate its members about the services that its member hospitals provide. Tr. 139:19-21.

58.    Coventry has no offices in Region 8. Tr. 142:17-18.  From September 2011 until April 2012 Coventry had only one provider relations representative for 19 Counties in Region 8. Tr. 157:23-24. This representative receives approximately 120 to 200 emails a day from Region 8. Tr. 157:8-9.

59.    Coventry has only two Outreach Coordinators for its 64,000 members in Region 8 to explain benefits, conduct clinics and health fairs, and try to manage care through preventive education. Tr. 161:3-16.  One of these two Outreach Coordinators also has responsibility for Region 7. Tr. 172:14-18. Another has responsibility for the entire state of Virginia and Knoxville, Tennessee. Tr. 158:10-13.

60.    The only analysis that the Cabinet has done of the adequacy of Coventry's network without the eight ARH hospitals was to determine whether Coventry's members are within a 45-mile radius of a Coventry hospital "as the crow flies." Tr. 182:20-183:2; Cab. Ex. 3; Tr. 193:15-21; 197:9-23. This 45 mile "as the crow flies" standard is not found anywhere in the Cabinet's regulations or in the Cabinet's contract with Coventry.

61.    The Cabinet objects to the characterization that its 45-mile radius is "as the crow flies." DE 64, p. 10.  Technically, the Cabinet is correct.  A crow could not fly in a line that straight.

62.     The Cabinet assumes a driving speed of 45 mph and that patients could drive the 45-mile radius in one hour. Tr. 187-188.  That would be true if the roads over the mountains were in straight lines like the radii.  Instead, the roads are narrow and very curvy, such that it would take significantly more than an hour to drive from the edge of the 45-mile radius.

63.     Coventry offered to transfer to Wellcare as a group 7,500 members who presently are using ARH so that those Medicaid recipients could continue to use ARH as an in-network facility. Tr. 5, 72.  ARH calculated that Coventry had more like 25,000 members who are long-term users of ARH physicians or facilities. *Id.*; ARH Ex. 13.  Coventry could identify these additional patients, but has declined to do so. Tr. 5, 73.

64.     ARH objected to the offer to transfer 7,500 patients, because that would have the effect of Coventry getting rid of the sickest patients and keeping those for whom little or no services are likely to be provided.  Such a process is referred to as "adverse selection." Tr. 72-73.

65.     The Court summarized this outcome as Coventry profiting or making money from its members who are using little services, but for which Coventry receives the same monthly payment from the Cabinet.  The MCO receiving the high-risk patients will be paying more for services and losing money as a result. Tr. 74-75.

66.     Interestingly, this is the precise problem that Coventry complained about in the letter to Governor Beshear regarding Kentucky Spirit's network: "[I]t is our concern that this uneven playing field has resulted in an unprecedented shift of higher-risk members to Coventry that cannot be fully mitigated through risk adjustment.  We recognize the seriousness of this charge, but CHFS policy has effectively allowed Kentucky Spirit to 'game the system' and granted them an unfair advantage." DE 24, Ex. D.

67.     Now, instead of complaining about Kentucky Spirit "gaming the system," Coventry wants to "game the system" itself and gain an unfair advantage by shifting its high cost patients to

Wellcare. Coventry behaves as though it wants to "cherry pick" the healthiest of patients in order to improve its bottom line and push the sickest patients to another MCO.

68.     It is inevitable that Wellcare will be the next to join the "game" and ask to terminate its contract with ARH, resulting in the sickest of patients having to travel long distances or foregoing care if they are not financially able to travel, and ARH losing a significant portion of its patient base.

69.     Even if Wellcare continues its agreement with ARH, but Coventry only permits its members to come to ARH for emergency services, there will be a severe impact on ARH. Medicaid is about 24 percent of ARH's business, and it is estimated that Coventry has about 50 percent of that. In hospitals, 50 to 60 percent of the costs are personnel or staff. The loss of those patients would result in significant changes, reductions in service and in the number of people employed. Tr. 30. In Harlan, probably half the patients are Medicaid. Tr. 31. Some services, such as obstetric services, would be put in jeopardy. Obstetric services are very expensive, and many hospitals, such as Mary Breckinridge Hospital, are eliminating those services for that reason. Tr. 31-32.

70.     Additionally, if ARH is treated as an "out of network" provider during any transition, as Coventry proposes, ARH will suffer a very significant reduction in fees for services through no fault of its own. (Compare payment rate in the LOA, DE 24-5, Ex. A, with 90 percent rate offered by Coventry Tr. 100). Coventry, on the other hand, will receive a windfall by losing the sick members and paying ARH less.

71.     The Cabinet, however, is in a very difficult position of trying to implement a managed care program with scarce resources of its own to assist in the process.

72.     The Court takes judicial notice that many persons in southeastern Kentucky in counties such as Harlan, Perry, and Leslie are the poorest of the poor, the neediest of the needy, and the least educated. They live in isolated areas, are extremely difficult to contact, and have little understanding of the choices they need to make to have ARH providers available to them when the need may arise.

73.     The sick Coventry members are in contact with ARH and can be informed regarding the available choices.  The well recipients have little or no contact with ARH and will not know that they even need to make a choice.  Even today, Kentucky Spirit members visit ARH and have to be informed that there is no participation agreement between it and ARH. Tr. 72-73.

74.     ARH has asked that all Coventry members in Region 8 be automatically shifted to Wellcare with an option to return to Coventry.  In the Court's opinion, that may create substantial confusion.

75.     Coventry's abrupt termination of its contract with ARH, without providing adequate notice and opportunity for a large portion its members to remain ARH patients by transferring to another MCO, has created a serious crisis in the Medicaid community in Eastern Kentucky.  Hopefully, the crisis is only temporary and can be resolved with sufficient time and appropriate education of Coventry members, along with necessary improvements in Coventry's network.

76.     The Cabinet has assured the Court on several occasions that it can process a large volume of Medicaid patients' requests to transfer to Wellcare very quickly.

77.     The Court finds that the impending termination of Coventry's contract with ARH is "cause" for a change in MCO's.

78.     The most practical way to improve the likelihood that both sick and well Medicaid recipients who wish to retain the use of ARH facilities understand the need to shift to Wellcare is for ARH to have an opportunity to contact the members directly.

79.      Accordingly, the Court will require Coventry to provide ARH with the names and addresses of Coventry members who may have availed themselves of ARH services under the direct reimbursement system during the past five years, as well as Coventry members for whom ARH has provided services so that ARH may contact these patients for informational purposes.  If Coventry does not have information regarding access to ARH prior to the implementation of the managed care system, the Cabinet shall participate in making this information available.

80.    Because ARH requested this information some time ago and Coventry has refused to provide it, and because Coventry has only two people on the ground (one of those only recently) to educate and assist some 64,000 members in Region 8 regarding their needs and options, the Court will impose a deadline of August 1, 2012 for the parties to provide this member information to ARH.

81.    Additionally, the Court will require Coventry to pay ARH at the LOA rates after June 30, 2012, through to the November open enrollment.  The Court will consider at a later date if Coventry might be entitled to shift some of these fees to ARH depending upon the circumstances at the time.

C.    **Discussion**

The Medicaid Act is Spending Clause legislation; in exchange for federal funds a State agrees to abide by specified rules in implementing the program. *See Douglas v. Independent Living Center of Southern California, Inc.*, 132 S.Ct. 1204, 1211(2012).  The Medicaid Act commits to CMS the power to administer the program, including enforcement of its requirements.  422 U.S.C. § 1316(a)(1).

The state imposes standards for timely access to care and services.  907 KAR 17:005, Sections 1(87) and 15(7)(b).  The Cabinet's standard requires that an MCO shall provide hospital care for which the transport time, under normal driving conditions and with no extenuating circumstances, shall not exceed sixty minutes from an enrollee's residence.  The Cabinet assumed that a 60-minute transport time can be converted to a straight-line distance of 45 miles.  Tr. 186-188.  This assumption is divorced from the reality of Medicaid Region 8 and seriously flawed in light of the mountainous region, poor roads and circuitous routes that must be traversed.  Coventry's proposed network that removes half the hospitals in Region 8's nineteen counties, assumes unrealistic driving times, and leaves a huge hole in the middle of the region without any access to obstetric care, is clearly inadequate.

The Court recognizes that Coventry's network in Region 8 is in a state of flux, as it has sent termination notices to other providers, but is also adding providers.  The Court also recognizes that there are administrative procedures for an MCO to submit a corrective action plan.  907 KAR 17:005 Section 14.  In the interim, however, the Court cannot allow patients to be cut off from their life-long physicians and hospitals  without an adequate opportunity to become informed regarding the impact of the termination of ARH's contract and the choices for the patients to make as a result. Additionally, the Court cannot allow Coventry to abruptly and dramatically reduce ARH's reimbursement rates for Medicaid services during any transition period, as Coventry is proposing to do.

Regarding ARH's motion for injunctive relief, the Court has considered whether the public interest would be served by granting injunctive relief.   The Court concludes that temporary injunctive relief is essential to maintain the status quo and to prevent the Medicaid recipients of Region 8 from being "thrown under the bus."   The health and well being of thousands of these patients hang in the balance, and many have already suffered hardships, stress and confusion as a result of Coventry's sudden notice of termination of its contract with ARH.

ARH serves a high-risk population in an economically depressed area.  If faced with a lengthy and costly trip to visit their primary care physician, many patients will simply forego preventive care, leading to worse health problems, higher-risk, and more expensive treatment in the future. DE 8-4, 8-8 at ¶¶ 15-16, 19.  Dr. Mullins testified specifically that there would be significantly less utilization of prenatal care. Tr. 88.  He also has a number of patients with medical complications for whom weekly fetal monitoring is very important to prevent fetal demise.  Tr. 89.

Additionally, ARH's ability to continue to serve as a safety net provider of health care for its service area will be jeopardized.  ARH provides approximately $130 million of uncompensated health care annually.  DE 8-8, p. 2.  Coventry's decision to terminate the LOA and its refusal to authorize out-of-network services for its members "has effectively stripped ARH of approximately

10% to 12% of its business." DE 8-8, ¶ 11.  This is causing immediate harm to ARH's financial well being.  Coventry has been forcing its members to access competing providers.  ARH knows from experience that when its relationship with patients is severed and replaced by competing providers, ARH has lost this business and will not likely ever regain it.  *Id.* at ¶ 13.  Medicaid pays ARH approximately 75 percent of its costs.  For 79 percent of its business, ARH receives less than 86 percent of its costs.  There is little opportunity to "cost shift" under the circumstances, and ARH is put in a difficult financial situation.  *Id.* at ¶ 20.  For out-of-network health care, Coventry offers to pay only 90 percent of the Medicaid rate, straining the financial picture even further.

Beginning with the week of May 7, 2012, ARH anticipated beginning staffing cuts of approximately 300 to 400 full-time equivalent positions.  *Id.* at ¶ 24.  These former employees will take with them many years of experience and skill, and the probable result is reduced services.  *Id.* at ¶ 30.  It is clear that ARH is likely to suffer irreparable harm absent an injunction.  ARH could not be made whole after it has suffered the permanent loss of a substantial number of employees, physicians, patients, and services.  *See Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1382 (6th Cir. 1995) (uncontradicted testimony showed business would not be able to operate and suffer economic collapse or insolvency).

With respect to ARH's likelihood of success on the merits, ARH claimed breach of contract based on breach of the adequate network requirements incorporated into the contract, the contractual prompt payment requirements, and the continuation of benefits provision.  DE 5, 8-2 at p. 20.  ARH offered proof that Coventry refused pre-authorization for ARH services to patients who were in their fourth or later month of pregnancy.  DE 8-8, Affidavit of Jerry Haynes ¶ 18; DE 8-9, Affidavit of Dr. Nathan Mullins.  *See also* ARH's Exs. 15, 17, Affidavits of patients being denied continuation of benefits and physicians who describe the adverse impact on their patients.

ARH also provided evidence that, as of April 30, 2012, Coventry owed "ARH approximately $3.3 million for Medicaid services of which approximately $1.4 million is over 30 days."  DE 8-8,

Affidavit of Jerry Haynes ¶ 21.  The problem was apparently so serious that Coventry was to testify

before a legislative committee investigating provider complaints about slow payments.  *Id.* at ¶ 22.

A party "is not required to prove his case in full at a preliminary injunction hearing." *Certified*

*Restoration*, 511 F.3d at 543.   ARH has shown a substantial likelihood of success on the merits

of its breach of contract claim.

No third parties will be harmed as a result of the injunction.  To the contrary, the Medicaid

recipients who wish to change from Coventry as their MCO in order to retain ARH as their provider

will be allowed time and information to make a more informed choice and will avoid harm from

extensive travel and/or lack of care.

Although not a required factor, it is noteworthy that Coventry will suffer little harm, if any.

Coventry already agreed and committed "to maintain ARH as an available preauthorized network,

out-of-network provider from now through the open enrollment period."  Tr. 100.  It also committed

"to pay ARH the Letter of Agreement rate for those services and providers who are providing care

under the continuation of care provisions of the Letter of Agreement."  *Id.*  These commitments

were made voluntarily by Coventry.  The Court is only requiring Coventry to do two things: (1) to

maintain the status quo until November 1, 2012, including paying ARH in-network rates as shown

on Exhibit A, Paragraph a. of the Letter of Agreement [DE 24-5]; and (2) to provide ARH a list of

Coventry members who have used ARH services during the past five years.

It is also clear from the evidence that, without injunctive relief, Coventry would obtain a

windfall at ARH's and/or Wellcare's expense.  The sickest of ARH patients would be in contact with

ARH and would switch to Wellcare.  The healthier patients are not likely to know about the need

to change MCOs and would stay with Coventry.  These patients would need few services.  While

being paid the same monthly amount per patient, Coventry could keep more of the payment to go

to its bottom line.  Additionally, during any transition of patients to Wellcare, Coventry would be

paying ARH substantially less for its services as an out-of-network provider.  Coventry wins and

Coventry wins. With injunctive relief, Coventry still achieves its goal of terminating the contract with ARH, but ARH does not suffer irreparable harm during the transition.

"The object and purpose of a preliminary injunction is to preserve the existing state of things until the rights of the parties can be fairly and fully investigated and determined....") *Performance Unlimited*, 52 F.3d at 1378. "The degree of proof necessary for each factor depends on the strength of the plaintiffs' case on the other factors." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996). ARH has shown sufficient public interest and irreparable harm, along with a substantial likelihood of success on the merits of their breach of contract claim to warrant injunctive relief.

## III.    CONCLUSION

ARH's motion for preliminary injunction [DE 8] is **GRANTED IN PART** as follows:

1.      Coventry and ARH will main the status quo under their Letter of Agreement to November 1, 2012, including payment to ARH of the rates listed on Exhibit A;

2.      Coventry, with the assistance of the Cabinet if necessary, will provide to ARH by August 1, 2012, a list of Coventry members who have used ARH services during the past five years

This June 20, 2012.



**Signed By:**

**_Karl S. Forester_**  K S F

**United States Senior Judge**