UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:12-CV-114-KSF

APPALACHIAN REGIONAL HEALTHCARE, et al.                    PLAINTIFF

vs.                            **OPINION AND ORDER**

COVENTRY HEALTH AND LIFE
INSURANCE COMPANY, et al.                                 DEFENDANTS

\* \* \* \* \* \* \* \*

This matter is before the Court on the Cabinet's motion for summary judgment. For the reasons discussed below, the motion will be granted in part and denied in part.

I.      **BACKGROUND**

The initial background facts of this case are set forth in the Court's June 20, 2012 Opinion granting a preliminary injunction [DE 67] and will not be repeated here. Subsequently, Coventry's agreement to include ARH in its network expired October 31, 2012. ARH's motion for summary judgment regarding rates to be paid by Coventry for out-of-network emergency and non-emergency services was granted. DE 130. King's Daughters' motion to file an Intervening Complaint was granted. DE 132. ARH's motion to file a Second Amended Complaint was granted, adding the Centers for Medicare and Medicaid Services ("CMS") and alleging that the granting of Kentucky's Section 1915(b) Waiver violated the Administrative Procedure Act. [DE 133]. Effective January 1, 2013, the Cabinet granted Coventry and WellCare a 7.7 percent rate increase. Kentucky Spirit cancelled its contract with Kentucky effective July 1, 2013. The Court is not aware of any contract having been entered into with a replacement managed care organization ("MCO").

ARH's First Amended Complaint alleged four claims against the Cabinet: (1) ARH is the third-party beneficiary of the contract between the Cabinet and Coventry, and the Cabinet breached the network adequacy and prompt pay provisions; (2) the Cabinet is conspiring with Coventry to

effectuate an unconstitutional taking of ARH's property; (3) the Cabinet is liable for payments for non-emergency services provided to Coventry's members; and (4) the Cabinet breached a provider agreement.  The Claims against Coventry include: (1) breach of contract for failure to meet prompt pay requirements; (2) declaratory and injunctive relief regarding prompt pay requirements; (3) bad faith in performance of the Letter of Agreement between Coventry and ARH; (4) declaratory relief requiring Coventry to pay ARH the reasonable value of its services; (5) violation of Kentucky's Any Willing Provider Laws; (6) tortious interference with ARH's existing and prospective contractual relationships; and (7) outrageous conduct.  DE 5.

The Cabinet's motion for summary judgment focuses on the defense of sovereign immunity. DE 57.  Coventry did not move to dismiss or seek summary judgment on the First Amended Complaint.

## II.    ANALYSIS

### A.    Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Redding v. St. Edward*, 241 F.3d 530, 532 (6th Cir. 2001).  In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

2

Once the moving party shows an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

The Cabinet asserts sovereign immunity under the Eleventh Amendment as a defense to all counts of the Amended Complaint. Generally, the Eleventh Amendment bars suits brought in federal court against states and their agencies. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989). A state's immunity, however, "comes with a host of exceptions." *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005). First, a state may waive the protection of Sovereign Immunity by a voluntary appearance and defense on the merits. *Lawson v. Shelby County, Tennessee*, 211 F.3d 331, 334 (6th Cir. 2000). Second, "Congress ... may abrogate the sovereign immunity of the states through statute." *Id.* Third, "a federal court may enjoin a 'state official' from violating federal law." *Id.* at 335, (citing *Ex parte Young*, 209 U.S. 123 (1908)). ARH does not rely on any statute that might abrogate the state's immunity, but it argues that the Cabinet consented to suit through its litigation conduct or, alternatively, that the *Ex parte Young* exception applies.

## B.    Litigation Conduct Waiver

ARH claims the Cabinet waived its sovereign immunity defense by its participation in this litigation. In particular, ARH notes that the Cabinet filed a general notice of appearance; responded to ARH's motion for preliminary injunction and addressed the merits of several claims; participated in settlement negotiations pursuant to an Order of this Court; participated in a telephonic status

3

conference; actively participated in a preliminary injunction hearing regarding termination of the Letter of Agreement between Coventry and ARH; and entered into an Agreed Order, all before raising sovereign immunity as a defense.  DE 80 at 8-15.

It is true that a state "appearing without objection and defending on the merits in a case over which the district court otherwise has original jurisdiction is a form of voluntary invocation of the federal court's jurisdiction that is sufficient to waive a State's defense of Eleventh Amendment immunity."   *Ku v. State of Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003).  It is also true that the "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one."  *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 241 (1985), *superseded by statute on other grounds,* Rehabilitation Act Amendments of 1986.

In *Ku*, the state initially was brought in involuntarily as a defendant.  Rather than asserting its Eleventh Amendment immunity defense, however, it "engaged in extensive discovery and then invited the district court to enter judgment on the merits."  *Ku*, 322 F.3d at 435.  Only after judgment was entered adversely to the state, did it raise the defense of sovereign immunity.  The court held the defense was waived.  *Id.*

In *Lapides v. Board of Regents of the University of Georgia*, 535 U.S. 613, 619-20 (2002), the court found waiver when the state voluntarily appeared in federal court by removing the plaintiff's case.  In *Hill v. Blind Industries and Services of Maryland*, 179 F.3d 754, 75 (9th Cir. 1999), the court found waiver when the state did not assert sovereign immunity until the first day of trial.  The relevant inquiry in cases of litigation conduct "must focus on the litigation act the State takes that creates the waiver."  *Lapides*, 535 U.S. at 620.

In the present case, ARH filed its Complaint on April 16 and its Amended Complaint on April 26, 2012.  ARH filed its motion for preliminary injunction on May 1, and the matter was set for an expedited hearing on May 4, in light of Coventry's stated intention to cancel its agreement with ARH on that date.  The parties were ordered to negotiate in the interim.  The parties agreed on May 4

4

to extend the contract until June 30 and to negotiate further. The Cabinet agreed that termination of the Coventry-ARH agreement would be a "for cause" basis for members to transfer to another managed care organization. DE 28. On May 18, the Cabinet filed its Answer to the Amended Complaint and asserted its sovereign immunity and governmental immunity defenses. DE 34. On June 11, 2012, the Cabinet moved for summary judgment based on immunity. DE 57. It asserted its sovereign immunity at an evidentiary hearing on June 12. DE 60 at 175:20 – 177:5.

The Cabinet did not gain any unfair tactical advantage by briefly defending itself on an emergency basis. Rather, the Cabinet's arguments merely explained its understanding of the current agreement. The injunctive relief was primarily aimed at Coventry, not the Cabinet. The assertion of sovereign immunity had no impact on the injunctive relief granted. It is the Opinion of this Court that the brief involuntary defense by the Cabinet and its prompt assertion of immunity does not rise to the level of a "litigation waiver."

####    C.    The *Ex parte Young* Exception

In *Moiser v. Kentucky*, 675 F. Supp.2d 693 (E. D. Ky. 2009), this Court said: "Suits against state officials for prospective injunctive relief are not barred by the Eleventh Amendment." *Id.* at 699. In *Telespectrum v. Public Service Commission of Kentucky*, 227 F.3d 414 (6th Cir. 2000), the Sixth Circuit held that the Eleventh Amendment did not bar a suit for *mandamus*, declaratory or injunctive relief demanding state officials comply with federal law:

> Under the doctrine of *Ex parte Young*, 209 U.S. 123, 159-60 (1908), suits against state officials seeking equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment. *See Michigan Bell Tel. Co. v. Climax Tel. Co.,* 202 F.3d 862 (6th Cir. 2000). The Supreme Court has underscored the importance of the *Ex parte Young* doctrine, stating it is an "essential part" of Eleventh Amendment jurisprudence, and must be upheld "if the Constitution [i]s to remain the supreme law of the land." *Alden v. Maine*, 527 U.S. 706, 747, 119 S.Ct. 2240, 2263, 144 L.Ed.2d 636 (1999). "An allegation of an on-going violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281, 117 S. Ct. 2028, 138 L.Ed. 2d 438 (1997)

*Id.* at 419.

5

More recently in *Westside Mothers v. Haveman*, 289 F.3d 852 (6th Cir. 2002), the court said:

> Of course, *Ex parte Young* is a "fiction" to the extent it sharply distinguishes between a state and an officer acting on behalf of the state, but it is a necessary fiction, required to maintain the balance of power between state and federal governments. "The availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause." *Coeur d'Alene*, 521 U.S. at 293. When a court addresses a claim made under *Ex parte Young* it should simply ask "whether a complainant alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* at 296. On its surface this case fits squarely within *Ex parte Young*. Plaintiffs allege an ongoing violation of federal law, the Medicaid Act, and seek prospective equitable relief, an injunction ordering the named state officials henceforth to comply with the law.

*Id.* at 861.

The Sixth Circuit explained the difference between retrospective and prospective relief as follows: "prospective relief merely compels the state officers' compliance with federal law in the future." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Judge Heyburn noted in *Kentucky Revenue Council v. United States Environmental Protection Agency*, 304 F. Supp. 2d 920 (W.D. Ky. 2004), that "[o]ne recognized exception to the Eleventh Amendment's sovereign immunity is that federal courts may enjoin an individual state officer from violating federal law and may grant a plaintiff prospective relief to stop an ongoing violation of federal law." *Id.* at 928-29. "The purpose of the *Ex parte Young* exception to sovereign immunity is to permit federal courts to enforce federal rights and hold state officials responsible to the supreme authority of the United States, where appropriate." *Id.* at 929.

The Cabinet string cites a number of cases that it claims recognize the Cabinet's blanket immunity. DE 57-1 at 10, n. 10. However, most of those cases merely recognize the Cabinet's immunity from "monetary" damages. For example, *SEFA v. Kentucky and Cabinet for Health and Family Services*, No. 5:12-32-JMH, 2012 WL 1158793 (April 5, 2012), holds that "the Cabinet is immune from monetary claims ... based on the Eleventh Amendment...." *Id.* at *2. The plaintiff's injunctive relief claims were considered but dismissed on other grounds. *See also Wesley v.*

6

*Campbell*, No. 10-51-DLB, 2010 WL 3120204 at *4 (August 5, 2010) ("The Eleventh Amendment therefore bars § 1983 actions against a state, its agencies, and its officials sued in their *official capacities for damages.")* (emphasis in original); *Crawford v. Child Protective Services*, No. 3:07-cv-21-H, 2007 WL 2772740 at *1 (Sept. 20, 2007) (plaintiff requested "counseling money, pain and suffering money, and punitive damages); *Barrett v. Benchmark Family Services*, No. 6:07-406-DCR, 2008 WL 2050996 at *2 (May 12, 2008) (case dismissed because plaintiffs were "only seeking monetary damages"); *Beall v. Oakwood Community Center*, No. 2007-CA-268, 2008 WL 399628 at *1 (Feb. 15, 2008) (wrongful death claim seeking damages).  These cases do not take anything away from ARH's position that prospective injunctive relief may be granted.

### D.    Mandamus and Speculation

The Cabinet also asserts that compliance with state law cannot be compelled by mandamus, ARH's federal claims are highly speculative, and ARH lacks standing to enforce any federal right.  DE 109 at 4-8.  The Cabinet's standing argument is addressed separately below. With respect to payments to ARH for non-emergency, out-of-network services, the Cabinet argues that the claims "are entirely speculative and not ripe for adjudication."  This Court disagrees and decided several months ago that "Coventry will pay ARH the 'reasonable value' of non-emergency services provided by ARH to Coventry members, which rate will be determined at a later court proceeding unless an agreement is reached earlier by the parties."  DE 130 at 8.

In response to the Cabinet's argument that compliance with state law cannot be compelled, ARH relies on *Hamblen v. Kentucky Cabinet for Health and Family Services*, 322 S.W.3d 511 (Ky. Ct. App. 2010).  *Hamblen* says: "From time immemorial, a writ of *mandamus* has been available to compel a public officer to perform a ministerial duty, and, in this Commonwealth, the writ has been widely utilized for over 150 years in such fashion."  *Id.* at 517.  The court continued:

> Some may argue that sovereign/governmental immunity or qualified official immunity operates as a bar to *mandamus* relief.  This argument simply represents a fundamental misunderstanding of the writ of *mandamus*.

*Id*. at 518.  "[T]he very essence of the writ of *mandamus* eludes the defense of immunity."  *Id.*  The court held that the plaintiff had "raised the necessary allegations for *mandamus* relief."  *Id.*

The difficulty with ARH's argument is that in *Hamblen*, a **state** court granted mandamus relief for state law claims.  Here, ARH is asking a **federal** court in some instances to compel state officials to enforce state law.  In *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984), the court said:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.  On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Id*. at 106.  Accordingly, *Ex parte Young* is "inapplicable in a suit against state officials on the basis of state law."  *Id.  See also Ernst v. Rising*, 427 F.3d 351, 369 (6th Cir. 2005) ("As requests for relief tied to state-law claims, we need not consider whether they are monetary or injunctive in nature, because they may not form the basis for an exception to state sovereign immunity in the federal courts in either event.").  Accordingly, any of ARH's claims against the Cabinet that are based solely on state law are not eligible for *mandamus* relief.  To the extent the claims against the Cabinet are based on federal law, however, *mandamus* relief is available in this Court.

### E.    Standing

The Cabinet argues that ARH lacks standing to bring the action.  Accordingly, the Cabinet contends that this Court lacks jurisdiction.  DE 57-1 at 18-21.  The parties agree on the applicable standard, but disagree on its application here.

The three elements of Article III standing are:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly ... traceable to the challenged action of the defendant, and not ... the result of the independent action of some third party not before the court.  Third, it must be

likely, as opposed to merely speculative that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).

This Court previously recognized the harm to ARH's financial interests if it must accept payment of only 90 percent of the Medicaid rates for out-of-network services, as required by the Cabinet in its contract with Coventry.  DE 67 at 20-21.  ARH also faced the permanent loss of a substantial number of highly skilled employees.  *Id.* at 21.  ARH further claims that the Prompt Pay provisions of federal and state law are being violated with impunity and that ARH's viability is threatened as a result.

In *Urban Health Care Coalition v. Sebelius*, 853 F. Supp.2d 101 (D.D.C. 2012), the court found injury in fact to a group of hospitals when their rate of reimbursement was reduced by a federal statute to less than they would otherwise be entitled.  *Id.* at 105.  There, the action ultimately failed the redressability prong, but injury was clear.  Similarly, a group of organizations owning or operating hospitals had standing to challenge the regulations and actions of the Secretary of Health and Human Services regarding alleged underpayment of "outlier" payments. *Banner Health v. Sebelius*, 797 F. Supp.2d 97, 108 (D.D.C. 2011).

The causation element is also satisfied in the present case.  The injury to ARH and others is directly caused by the Cabinet's contract requiring reduced payments to out-of-network providers.  A related factor is the Cabinet's failure to require adequate networks of providers, so that MCOs like Coventry have an incentive to dump providers to reduce costs.[1]  A related bonus

---

[1]  The July 2013 Special Report of the Kentucky State Auditor noted an overall 8 percent decline in all provider types, and a 57 percent decline in general hospitals participating since the implementation of Medicaid managed care program.  A related concern was "how contractual requirements [for network adequacy] in certain rural areas are met given the challenging geography in many parts of the state."  "A major issue which surfaced during Kentucky's switch to a managed care environment for the Medicaid program was the adequacy of each MCO's provider network. ...  An inadequate network would make it difficult for Medicaid members to receive proper treatment and healthcare."  (Continued on next page.)

to the MCOs is their ability to discourage the sickest patients from using services by limiting providers and, thereby, limiting the patients' accessability to healthcare.

The Cabinet was clearly told in the past that it could not solve its budgetary woes on the backs of Kentucky's Medicaid recipients.

> Focusing solely on budgetary concerns simply does not rise to the level of a reasonable standard for determining eligibility for long-term care services and is inconsistent with Medicaid objectives.  If the Court accepts Plaintiff's allegations as true, Kentucky has inappropriately chosen to use cost-savings as the sole touchstone in its determination, focusing on how much money it wants to save rather than upon the medical needs of Medicaid recipients or the Medicaid statutory requirements.

*Kerr v. Holsinger*, No. 03-68-H, 2004 WL 882203 at *5 (E. D. Ky. 2004).

At least part of the financial harm to ARH resulting from Coventry's attempted abrupt cancellation of its Letter of Agreement has already been redressed by this Court through injunctive relief.  Additionally, the Court has held that Coventry must pay ARH the reasonable value of its non-emergency services provided to Coventry members.  DE 130.  A decision in favor of ARH that the Cabinet can no longer require such reduced rates would further redress ARH's injury and provide protection with respect to any other MCO that may be obligated to pay for non-emergency services.  A decision by this Court that the Cabinet must enforce the Prompt Pay provisions would redress the payment delays that ARH currently suffers.  Accordingly, ARH meets all standing requirements.

## F.    Federal Enforceable Rights

The Cabinet argues that there is no private cause of action under the Medicaid statutes relied upon in ARH's complaint.  DE 109 at 8-14.  The test for whether a federal statute creates rights that are privately enforceable against state officers was first described in *Blessing v. Freestone*, 520 U.S. 329 (1997) as follows:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the

---

http://apps.auditor.ky.gov/Public/Audit_Reports/Archive/2013MedicaidManagedCarereport.pdf ("Auditor's Report") at Page iii.

statute is not so "vague and amorphous" that its enforcement would strain judicial competence.  Third, the statute must unambiguously impose a binding obligation on the States.  In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*Id.* at 340-41.  In *Gonzaga University v. Doe*, 536 U.S. 273 (2002), the court clarified that "it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced...."  *Id.* at 283.

A number of courts have found the existence of private rights of action for Medicaid recipients, including the Eastern District of Kentucky.  In *Kerr v. Holsinger*, No. 03-68-H, 2004 WL 882203 (E.D. Ky. March 25, 2004), the court held that Medicaid recipients residing in nursing facilities had a private right of action against the state for alleged violations of 42 U.S.C. 1396a(a)(17), which required a state plan for medical assistance to "include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan ... which are consistent with the objectives of [the Act]."  *Id.* at *5.  In *Kerr*, the court found the eligibility standards were manipulated "to make up for budget deficits," rather than being consistent with the objectives of the Act.  *Id.* at *8-9.

Similarly, in *Michelle P. v. Holsinger,* 356 F. Supp.2d 763 (E. D. Ky. 2005), the plaintiffs, who were adults with mental retardation, were eligible for, but were being denied, Intermediate Care Facilities for the Mentally Retarded ("ICF/MR").  The relevant statutes provided in part: "A State plan for medical assistance must ... provide ... for making medical assistance available ... to all [eligible] individuals." 42 U.S.C. § 1396a(a)((10)(A).  "The term 'medical assistance' means payment of part or all of the cost of the following care and services ... for individuals ... who are eligible [for]: ... services in an intermediate care facility for the mentally retarded...."  42 U.S.C. § 1396d(a)(15).  A state "must provide ... assistance ... with reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8).  The court found that the statutes "unambiguously confer[red] individual federal rights enforceable under § 1983."  *Id.* at 767.  The same conclusion was reached in *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 189-90 (3d Cir. 2004).

11

Although the specific statute at issue (the Boren Amendment) was later repealed, the logic of *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498 (1990), remains applicable to other Medicaid statutes that have not been repealed.  The Amendment said a State plan for medical assistance must "provide ... for payment ... of the hospital services ... through the use of rates (determined in accordance with methods and standards developed by the State ...) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities...."  *Id.* at 502-3.  Virginia hospitals claimed the rates they were being paid were not reasonable and adequate and sought injunctive relief.  The district court rejected an argument that there was no cause of action to challenge the state's compliance with the Medicaid Act. In affirming, the Supreme Court said:

> We must therefore determine whether the Boren Amendment creates a "federal right" that is enforceable under § 1983. Such an inquiry turns on whether "the provision in question was intend[ed] to benefit the putative plaintiff." *Ibid.* (citations and internal quotations omitted). If so, the provision creates an enforceable right unless it reflects merely a "congressional preference" for a certain kind of conduct rather than a binding obligation on the governmental unit, *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 19, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981), or unless the interest the plaintiff asserts is " 'too vague and amorphous' " such that it is " 'beyond the competence of the judiciary to enforce.' " *Golden State,* supra, 493 U.S., at 106, 110 S.Ct., at 448 (quoting *Wright*, supra, 479 U.S., at 431-432, 107 S.Ct., at 774). Under this test, we conclude that the Act creates a right enforceable by health care providers under § 1983 to the adoption of reimbursement rates that are reasonable and adequate to meet the costs of an efficiently and economically operated facility that provides care to Medicaid patients. The right is not merely a procedural one that rates be accompanied by findings and assurances (however perfunctory) of reasonableness and adequacy; rather the Act provides a substantive right to reasonable and adequate rates as well.
>
> There can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment.  The Provision establishes a system for reimbursement  of providers and is phrased in terms benefiting health care providers....

*Id.* at 509-10.

In the present case, ARH makes claims against Coventry and the Cabinet under the Prompt Pay provisions of federal and state law and  seeks declaratory and injunctive relief.  Under 42 U.S.C. § 1396a(a)(37), a state plan for medical assistance must:

provide for claims payment procedures which (A) ensure that 90 per centum of claims for payment (for which no further written information or substantiation is required in order to make payment) made for services covered under the plan and furnished by health care practitioners through individual or group practices or through shared health facilities are paid within 30 days of the date of receipt of such claims and that 99 per centum of such claims are paid within 90 days of the date of the receipt of such claims....

*Id.*  Additionally, section 1396u-2(f) states in part:

A contract ... with a medicaid managed care organization shall provide that the organization shall make payment to health care providers for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan ... on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title....

42 U.S.C. § 1396u-2(f).

Similar Prompt Pay claims were raised in *National Medical Care, Inc. v. Rullan*, No. 04-1812(HL), 2005 WL 2878094 (D. Puerto Rico Nov. 1, 2005).  That court noted the decision in *Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56, 75 (1st Cir. 2005),  that a federally-qualified health center had a private right of action under § 1983 to enforce Medicaid's Section 1396a(bb)(5) on wraparound payments to "health care practitioners and/or facilities."  The district court held that §§ 1396a(a)(37) and 1396u-2(f) similarly identified "a discrete class of beneficiaries" – health care practitioners and health care providers.  *Id.* at 8.  It further held that the requirement for claims payment procedures "ensuring that a specific percentage of the services are paid within a specified period of time, constitutes rights-creating language, because that provision is neither vague nor amorphous in imposing a binding obligation on the State."  *Id.*  Accordingly, the dialysis clinic plaintiffs in *Rio Grande* had a private right of action against the state and federal health secretaries to require compliance with federal law regarding payments to the providers.  *See also Consejo de Salud de la Comunidad de la Playa de Ponce, Inc. v. Gonzalez-Feliciano*, 695 F.3d 83 (1st Cir. 2012) (enforcing wrap around payment provisions for several federally-qualified health centers); *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 212 (4th Cir. 2007) (holding that rural health clinics have a private right of action to enforce payment provisions of § 1396a(bb)).

Likewise in the present case, §§ 1396a(a)(37) and 1396u-2(f) impose specific requirements regarding payment of health care providers.  First, the beneficiaries of these statutory provisions are expressly named as "health care practitioners" and "health care providers."  Medicaid recipients are not obligated to pay providers for their care, except a possible co-pay or deductible.  Prompt payment requirements certainly do not benefit the MCO, which would prefer to keep its money instead of paying it to a provider.  Each provider of services would benefit so long as the claim does not require further written information or substantiation.  As in *Wilder*, the focus is on individual claims and providers, rather than an institutional policy or practice, such as the broad *Blessing* requirement of "substantial compliance ... throughout all programmatic operations."  *Blessing*, 520 U.S. at 341.  The importance of this issue to providers was stressed in the July 2013 Special Report by Kentucky's Auditor of Public Accounts.

> One of the most significant and troubling concerns centered on whether Kentucky's rural hospitals could continue to afford to "float" Medicaid related costs.  Hospital representatives indicated that rural hospitals are not equipped for the sudden financial stress put upon them by the managed care program.  The matters brought to our attention include increasing accounts receivable impacting the hospitals' cash flow, increased administrative burden for hospitals in trying to file claims to MCOs, below cost reimbursements related to emergency department triage fee policies, and reporting difficulties due to a lack of information available from MCOs.

http://apps.auditor.ky.gov/Public/Audit_Reports/Archive/2013MedicaidManagedCarereport.pdf ("Auditor's Report") at page ii.  As noted above, the report also expressed concern regarding network adequacy and adequate access to care.

Second, the prompt payment rights protected by the statute are not so vague and amorphous that enforcement would strain judicial competence.  Every provider is entitled to be paid a specific percentage of claims within a definite period of time.  Third, the requirements are mandatory – "must provide," "shall provide," and "shall make payment."  Accordingly, all of the requirements of *Blessing* and *Gonzaga* are met in the present case, and health care providers have a cause of action to pursue their federal claims.

This Court respectfully disagrees with the decision in *Medevac Midatlantic, LLC v. Keystone Mercy Health Plan,* 817 F. Supp.2d 515 (E. D. Pa. 2011), in which the court distinguished *Wilder* because the statute tied "reimbursement rates to providers' costs, creating an unmistakable focus on providers' needs." *Id.* at 523. The statute in *Wilder* said a plan must provide for payment of hospital services through rates found to be reasonable and adequate to meet costs. Section 1396u-2(f) requires an MCO to "make payment to health care providers ... on a timely basis." There is no other conceivable intended beneficiary of § 1396u-2f than "health care providers" and the focus is on their need for prompt payment. The court even recognized "the facially provider-focused language of Sections 1396n(b)(4) and 1396u-2(f)" and that it "appears to be similar to that found to create an enforceable individual right in *Wilder* and *Sebree.*" *Id.* at 523-24. Nonetheless, it held that the statutory requirement in § 1396a(a)(37)(A) "does not require that all providers be paid within these time frames" and that "no individual provider is entitled to timely payment." *Id.* at 524-5. In other words, the statute does not mean what it so plainly says. The *Medevac* court also ignored the language in § 1396u-2(f) that an MCO can only be exempted from the prompt pay provisions if "the health care provider and the [MCO] agree to an alternate payment schedule." The exemption is provider specific, further demonstrating that the general rule is intended to benefit individual providers.

### G.    Miscellaneous Other Arguments

The Cabinet cites *Prince George's Hospital Center v. Advantage Health Plan, Inc.*, 865 F. Supp.2d 47 (D.D.C 2012) for the proposition that the court "rejected the idea that the hospital was a third-party beneficiary to the MCO contract...." DE 57-1 at 23. To the contrary, that case holds: "As a result of Advantage's promise to the District of Columbia under the MCO contracts, Advantage has a duty to make certain payments to providers, as third-party beneficiaries, which may be enforced by the providers against Advantage as the alleged breaching promisor." *Id.* at 58.

15

The Cabinet argues ARH's unconstitutional taking claims are not yet ripe.  Citing *DLX, Inc. v. Kentucky*, 381 F.3d 511, 518 (6th Cir. 2004), the Cabinet says: "[f]ederal court takings claims are not ripe until the government seizes property and the former owner seeks and is denied just compensation through available remedies."  *DLX* holds, however, that it is only necessary "that the decisionmaking body has come to a 'final' decision, allowing the federal courts to assess how much use of the property is allowed."  *Id.* at 518.  The Cabinet reached a final decision on payment of out-of-network providers when it included a 90 percent rate in its contract with Coventry.  There is no procedure to seek compensation for the remaining 10 percent.  The claim is ripe.

The Cabinet also relies on the doctrine of exhaustion of administrative remedies as a reason to dismiss ARH's claims.  This case is not a standard administrative appeal, nor a standard breach of contract action.  There are no administrative remedies to exhaust.  ARH also notes that exhaustion is not required in a § 1983 action.  DE 80 at 37.  *DLX*, 381 F.3d at 519 ("exhaustion is never required in § 1983 suits").

III.   **CONCLUSION**

**IT IS ORDERED** that the Cabinet's motion for summary judgment [DE 57] is **GRANTED to the extent** that ARH seeks *mandamus* against the Cabinet based only on state law and is otherwise **DENIED**.

This September 11, 2013.



**Signed By:**

***Karl S. Forester***  *KSF*

**United States Senior Judge**

16