UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:12-CV-114-KSF

APPALACHIAN REGIONAL HEALTHCARE, et al.                              PLAINTIFF

vs.                              **OPINION AND ORDER**

COVENTRY HEALTH AND LIFE
INSURANCE COMPANY, et al.                                            DEFENDANTS

\* \* \* \* \* \* \* \*

This matter is before the Court on the Cabinet's motion to vacate and dissolve the partial finding of contempt dated July 16, 2012. For the reasons discussed below, the motion will be denied.

**I.    BACKGROUND**

When Coventry Health and Life Ins. Co. ("Coventry") decided to terminate precipitously its Letter of Agreement ("LOA") with Appalachian Regional Healthcare ("ARH") on May 4, 2012, it triggered a chain of events for which this Court repeatedly sought assurance from the Cabinet that Medicaid patients relying on ARH as their provider could quickly move to another Managed Care Organization ("MCO") that included ARH in its network. On May 2, 2012, the Cabinet for Health and Family Services ("Cabinet") advised that Coventry was required to give members thirty days written notice prior to actual termination and would be giving that notice. The Cabinet said that "[s]uch notice will give each member the opportunity to request a change in MCO should that member desire to make such a request." DE 22 at 2.

During a hearing on May 4, 2012, the Cabinet said it had "received about a thousand requests to move from Coventry to a different MCO recently and those are in the process now." DE 77, pp. 10-11. The Court expressed concern about how expeditious the process might be and asked the Cabinet to "assure us that you're going to be able to act promptly and expeditiously on their request for change." *Id.* at 9. Later, the Court said that if ARH and Coventry do not reach an agreement, "then

I want to be assured by the state that there will be a new provider and that the state will act expeditiously on the change request." *Id.* at 46. The Cabinet said, "[i]f ... there's going to be a movement of members, we can use the loss of ARH as for cause ... and process them all." *Id.* at 49.

In an Agreed Order that same day, the Cabinet said:

> 3. Should Coventry or ARH determine that further negotiations ... are futile, the parties shall advise the Court immediately to ... ensure that there is a process in place to grant members adequate notice of the termination of ARH as a provider in the Coventry network.
>
> 5. The Cabinet shall deem any termination of the Coventry-ARH LOA to be a "for cause" basis to transfer members to another managed care organization in an expedited manner, and in accordance with the member's choice.

DE 28.

On May 25, Coventry advised the Court and the Cabinet that negotiations with ARH had been ongoing, but it "appears unlikely that these differences can be bridged." DE 38 at 3. The matter was set for a hearing on May 31, 2012, and the Court wanted to know, among other things, "what arrangements the Cabinet has made to ensure" that ARH patients will have coverage from other MCO's that include ARH without any interruption. DE 40. Coventry's letter to give thirty-days notice of the termination of ARH as a provider was discussed, and ARH requested information on Coventry members so that ARH could contact them as well. DE 70 at 10. The Court noted that it was "obvious" that Coventry and ARH were "at an impasse" regarding rates. *Id.* at 27. By agreement of the parties, the LOA was set to expire June 30. *Id.* at 30.

The Cabinet said Coventry's letter to its members would "give them the opportunity .... to move to either WellCare or to Kentucky Spirit." *Id.* at 30-31. The Cabinet assured the Court that: "[w]e are prepared to take any of those people who call and put them either with WellCare if they ask for it or Kentucky Spirit[1] if they ask for it." DE 70, p. 32. The letter to members contained a phone number

---

[1] Kentucky Spirit did not include ARH as a network provider, so transfers by ARH patients to that MCO were unlikely.

2

for people to call and request a transfer, and the Cabinet assured the Court that callers would not get a busy signal and that transfers could be made in thirty days. *Id.* at 43-44.

An evidentiary hearing on ARH's motion for injunctive relief was held June 12, 2012. DE 62. Partial injunctive relief was granted June 20, with the opinion stating in part:

> The Cabinet has assured the Court on several occasions that it can process a large volume of Medicaid Patients' requests to transfer to WellCare very quickly. The Court finds that the *impending* termination of Coventry's contract with ARH is "cause" for a change in MCO's.

DE 67, ¶¶ 76-77 (emphasis added). Coventry was required to provide ARH by August 1 with names and addresses of Coventry members who had used ARH's services during the past five years, so that ARH could contact them directly and thereby improve the likelihood that both sick and recovered Medicaid recipients would be aware of the need to change to WellCare if they wanted to continue with ARH. *Id.*, ¶¶ 78-79. Coventry was also required to maintain the status quo and pay ARH at in-network rates until November 1, 2012 to avoid irreparable harm to ARH during the transition. *Id.* at 22.

ARH exerted considerable effort to communicate widely about the upcoming termination, and approximately 8,500 transfer requests were submitted to the Cabinet. On July 5, ARH moved for a show cause hearing because the Cabinet was refusing to process any of the "for cause" transfer requests. At the July 12 hearing on the motion, the Cabinet testified that there were problems with about 20 percent of the requests, and they quit processing all requests in "mid-May." DE 108 at 67-68. The Cabinet also, at some point, decided to have an open enrollment period from August 20 to November 1, 2012. DE 111-1 at 10.

This Court concluded that ARH "established by clear and convincing evidence that the Cabinet violated Court orders to process thousands of requests by ARH patients to transfer from Coventry to WellCare of Kentucky, Inc. 'for cause' in an expeditious manner." In its motion to vacate, the Cabinet argues that it did not "refuse" to process requests from patients to transfer from Coventry in light of the impending termination of its contract with ARH. DE 111-1 at 1. It simply acted on the advice of

3

counsel to "delay responding to requests it received from Members who wanted to move from Coventry because ARH was no longer in Coventry's network." *Id.* at 2. It also claims it "reasonably interpreted the continuation of the LOA to November 1 to void any 'for cause' transfer contemplated in the May 4 Agreed Order." *Id.* It contends the Court "was simply incorrect" in forming any impression that moving members from one MCO to another would have any "impact on their ability to receive medical services." *Id.* The Cabinet also claims that it "simply missed the significance of the 'impending' termination of the LOA for the Court." *Id.* at 6. It relies on the fact that "the Order is silent on ordering the Cabinet to process enrollment transfer requests by any date certain" (DE 114 at 4) and that it "did not mandate the Cabinet begin processing transfer requests while its preliminary injunction is in place" (*Id.* at 12). Without any supporting evidence, the Cabinet claims: "[n]o member has been harmed by the Cabinet's good faith reliance on the Preliminary Injunction to delay processing for cause transfer requests until after the Open Enrollment period ends." *Id.* at 6.

**II.     ANALYSIS**

The parties do not disagree on the applicable contempt standard. "In order to hold a litigant in contempt, the movant must produce clear and convincing evidence that shows that 'he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" *Electrical Workers Pension Trust Fund of Local Union # 58, IBEW v. Gary's Electric Service Co.*, 340 F.3d 373, 379 (6th Cir. 2003). The Cabinet argues that the Court's Orders were not definite and specific enough because there was no date certain for completion of the transfers. It also relies on the June 20 injunction as relieving it from any requirement to process requests.

The flaw in the Cabinet's logic that the injunction relieved it from its obligation is that it quit processing change requests long before the injunction was issued. The Cabinet's current motion says "[w]hen this lawsuit was filed and the issue of temporary injunctive relief was put before the Court, the Cabinet began holding the change requests in abeyance...." DE 111-1 at 4. Prior to that, "the Cabinet

had been processing the requests received, many of which were **denied** because the ARH-Coventry contract was still in place. *Id.* (Cabinet's emphasis).

On May 2, the Cabinet said Coventry's thirty-day notice "will give each member the opportunity to request a change in MCO." DE 22 at 2. At the May 4 hearing, the Cabinet did not say it was holding requests in abeyance or denying them because the contract had not been terminated yet. Instead, it said: "we received about a thousand requests to move from Coventry to a different MCO recently and those are in the process now." DE 77 at 10-11. In response to the Court's concerns, the Cabinet said "we can use the loss of ARH as for cause ... and process them all." *Id.* at 49. The May 4 Agreed Order said: "The Cabinet shall deem any termination of the Coventry-ARH LOA to be a 'for cause' basis to transfer members to another managed care organization in an expedited manner, and in accordance with the member's choice." DE 28. The Agreed Order also said that the LOA was scheduled to terminate on June 30.

On May 25, there was an obvious impasse between Coventry and ARH. DE 38 at 3. A status conference was held on May 31. DE 46. The Cabinet again referenced Coventry's thirty-day notice letter, which would give members "the opportunity to move to either WellCare or to Kentucky Spirit." DE 70 at 30-31. The Cabinet said it was "prepared to take any of those people who call and put them either with WellCare if they ask for it or Kentucky Spirit if they ask for it." *Id.* at 32. The Acting Medicaid Commissioner, Neville Wise, said "we can do it in thirty days." *Id.* at 44. ARH claims, and there is no disagreement, that "the Cabinet was emphatic that logistics required that change requests had to be made by June 20 if they were to be processed to become effectively July 1." DE 112 at 4.

The Court's rapid-fire scheduling of hearings, telephonic conferences, status conferences, and repeated requests for assurances from the Cabinet that transfers will occur quickly and expeditiously were more than adequate to make clear that time was of the essence. Meanwhile, the Cabinet was deliberately doing nothing with the transfer requests, while it assured the Court that it was processing them expeditiously. There was no injunction or extension of the termination deadline that could

possibly confuse the Cabinet at this point. There was no ambiguity in the May 4 Agreed Order. Even as the Cabinet's own deadline of June 20 approached and the LOA was to terminate on June 30, the Cabinet still did not process member transfer requests.

The Cabinet argues that its agreement to process transfers was voided once injunctive relief was granted on June 20 and the termination date was extended to November 1. DE 111-1 at 2. It never asked the Court to vacate the order, however. Instead, it chose to ignore it. The Cabinet contends there is no need to transfer "for cause" if there is an open enrollment period in the interim. If that were the case, why did the Court expressly find in the injunction that "the impending termination of Coventry's contract with ARH is 'cause' for a change in MCO's"? DE 67, ¶ 77. Thousands of change requests were submitted to the Cabinet, but it never processed any of them. Instead, it required those who had already requested a transfer to wait until August 20 and request a change again during Open Enrollment. It deliberately took this action despite its acknowledgment that people only read part of what they get about open enrollment, don't always react quickly, and many people miss their deadlines for re-enrolling. DE 70 at 8, lines 18-25.

The Cabinet also argues that there is no "gap" in medical services for members moving from one MCO to another and there is "no impact on their ability to receive medical services." DE 111-1 at 2. ARH responds with affidavits from two physicians who were told their contracts with Coventry were being terminated effective August 30, 2012. Yet the Cabinet advised that any patient requests to transfer MCO's would not take effect until November 1, 2012. DE 112-1, ¶ 12; 112-2, ¶ 7. One of the doctors is the only surgeon at McDowell ARH; thus, patients needing surgery would have to travel to another hospital. DE 112-1, ¶ 17. The doctors were told that the "patients would just have to see another doctor elsewhere until November 1." DE 112-2, ¶ 8. When asked about requesting a change for cause, the Cabinet said those requests take 90 days to process, must go through many channels, and may or may not be approved. *Id.* ¶ 13. Another doctor was told her patients "could see someone else in the area who takes Coventry." DE 112-3, ¶ 8. Fortunately for these patients, Coventry once

6

again failed to send patients the required thirty-day notice of termination. As a result, the termination date was extended to November 1.

The Cabinet recognizes that "[m]any Medicaid members are the sickest of the sick, the poorest of the poor, and relatively uneducated and unsophisticated. Some are illiterate." DE 114 at 3. Despite these disadvantages and a shortage of transportation, these Medicaid recipients have been required by the Cabinet to jump through hoop after hoop in order to receive necessary medical care. While the Cabinet maintains it "would never knowingly and intentionally violate a direct Court order," its reputation precedes it for willfully violating statutes and court orders relating to child abuse records. *See, e.g. Commonwealth of Kentucky Cabinet for Health and Family Services v. Lexington H-L Services, Inc.*, 382 S.W.3d 875 (Ky. Ct. App. 2012). Accordingly, the motion to vacate the contempt order will be denied.

The Cabinet also requested an opportunity to purge itself of the contempt by cross referencing the transfer requests and the Open Enrollment changes. DE 111-1 at 15-16. "ARH agrees the Cabinet should audit or compliance check the results of its open enrollment. But it should also be transparent with the Court about its efforts today if it wants to purge itself of contempt." DE 112 at 8. Accordingly, the Court will consider a proposal from the Cabinet for future compliance checking or a demonstration that such checking has already occurred. The Cabinet shall file a new motion to purge itself of the contempt with evidentiary support, to which ARH may respond.

### III. CONCLUSION

**IT IS ORDERED** that the Cabinet's motion to vacate the contempt finding [DE 111] is **DENIED**, but the Court will consider a future motion by the Cabinet to purge itself of contempt.

This September 18, 2013.



Signed By:

*Karl S. Forester*  KSF
**United States Senior Judge**

7