UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION – LEXINGTON

| | |
|---|---|
| APPALACHIAN REGIONAL HEALTHCARE, INC., et al., | CIVIL ACTION NO. 5:12-114-KKC |
| **Plaintiff,** | |
| V. | **OPINION AND ORDER** |
| COVENTRY HEALTH AND LIFE INSURANCE CO., UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | **TO BE FILED UNDER SEAL** |
| **Defendants.** | |

This matter is before the Court on the motion for summary judgment (DE 278) filed by defendant Coventry Health and Life Insurance Company.

**I.     Background**

The plaintiffs – referred to collectively as Appalachian Regional – provide healthcare in Kentucky.  With their complaint, they challenge certain actions by the state and federal governments and a private managed care organization in the administration of Kentucky's Medicaid program.

The purpose of that program is to provide government funding for medical care of individuals who cannot afford to pay for that care on their own. *Arkansas Dept. of Health and Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). Through the program, the federal government provides funds to help states deliver healthcare to their needy citizens. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990).

The Department of Health and Human Services is the federal agency that administers the program. *Ahlborn*, 547 U.S. at 275. It does so through the Centers for

Medicare and Medicaid Services (CMS). *Id*. The Court will refer to the federal department and CMS collectively as CMS in this opinion. The Kentucky Cabinet for Health and Family Services is the state agency that administers Kentucky's Medicaid program. KRS §§ 194A.010(1), 194A.030(2). CMS and the state cabinet are both defendants in this action.

To qualify for federal financial assistance to administer their Medicaid programs, states must comply with certain federal requirements. *Va. Hosp. Ass'n*, 496 U.S. at 502. For example, the state must establish a plan for reimbursing healthcare providers for the medical services they provide to needy citizens. *Id*.

Prior to November 1, 2011, the Kentucky state cabinet directly reimbursed doctors and hospitals for the services they provided to Medicaid recipients pursuant to a fee schedule set by the state. This is known as a fee-for-service system. *See Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 426 (6th Cir. 2013). In 2011, however, CMS approved Kentucky's application for a waiver that permits the state to administer its Medicaid program as a managed-care program instead of reimbursing providers under the traditional fee-for-service model. (DE 274-2, Glaze Dec. ¶¶ 5, 6.) This was done in an effort to control "ballooning Medicaid costs and resulting pressures on the state's budget." *Appalachian Reg'l*, 714 F.3d at 426.

Under a managed-care program, the Cabinet no longer directly reimburses doctors and hospitals for the healthcare services they provide. Instead, the Cabinet now pays a group of third-party administrators called managed care organizations (MCOs). *Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 5:12-CV-114, 2012 WL 2359439, at * 1 (E.D. Ky. June 20, 2012). The state awards contracts to certain MCOs,

which are charged with managing healthcare services for Medicaid beneficiaries who sign up to become "members" of one of the MCOs. *Id.*

The Cabinet pays each MCO a flat monthly fee – called a capitation payment – for the healthcare of each of the MCO's members who is a Medicaid recipient. *Id.* The capitation payment is a set fee that the Cabinet pays for each MCO member, whether or not the member actually receives any health services that month. 42 C.F.R. § 438.2. The MCO then pays the healthcare providers for the healthcare services actually rendered to its members. "So the MCO bears the risk that the costs of care may exceed the capitation payment. But on the other side, it stands to profit if beneficiaries use fewer services." *Appalachian Reg'l*, 714 F.3d at 426.

The state converted to the managed-care model in order to "improve healthcare access and quality by eliminating unnecessary care, enhancing coordination among providers, emphasizing preventative care, and promoting healthy lifestyles." *Id.* The state also believed that the conversion would save it money. *Id.*

The Cabinet initially awarded contracts to three MCOs: Coventry Health and Life Insurance Co., Kentucky Spirit Health Plan, Inc., and WellCare of Kentucky, Inc. *Appalachian Reg'l*, 714 F.3d at 426. The MCOs were charged with administering healthcare in seven of the state's eight Medicaid regions. One of those regions is Region 8 which is made up of 19 counties in eastern and southeastern Kentucky that "are among the most economically depressed, underserved, and medically needy in the Commonwealth." *Id.* at 426-27.

As part of the waiver approval, CMS must approve both the state's contracts with the MCOs and the capitation payments to be paid to the MCOs. 42 C.F.R. §§ 438.6(a),(c), 438.806(c). The capitation payments are set forth in the contracts between the Cabinet and each MCO. CMS reviewed the contracts for compliance with the Medicaid Act and the

applicable regulations. 42 U.S.C. §1396b(m); 42 C.F.R. § 438.806. CMS approved each of the contracts, including the designated capitation rates, for the period of November 1, 2011 to June 30, 2014. (DE 135-3, CMS Letter Oct. 28, 2011; DE 274-2, Glaze Decl. ¶¶ 7-12.) These initial MCO contracts expired on June 30, 2014. (DE 274-2, Glaze Decl. ¶13.)

The MCOs, in turn, contracted with healthcare providers who make up each MCO's healthcare-provider "network." *Appalachian Reg'l*, 2012 WL 2359439, at *1. Each MCO's network must meet certain state and federal standards. These "so-called network-adequacy requirements . . . obligate an MCO to maintain a provider network that guarantees certain services are accessible to its members within specified times or distances from their homes." *Appalachian Reg'l*, 714 F.3d at 427.

For healthcare services rendered to their members, the MCOs pay healthcare providers who are *in their network* the amount set forth in the contracts between the parties. (DE 278-1, Mem. at 8.) Coventry entered into a temporary agreement with Appalachian Regional, which made Appalachian Regional a provider in Coventry's network. *Id*. The agreement provided that Coventry would pay 107.5 percent of the Medicaid rate for inpatient services. (DE 278-19, Agreement, Ex. A.)

For healthcare services rendered to an MCO's members by healthcare providers who are *not in their network* – out-of-network providers – the amounts paid to providers are governed by other guidelines. For emergency services, federal law prohibits out-of-network providers from charging more than 100 percent of the Medicaid rate. 42 U.S.C. § 1396u-2(b)(2)(D). The MCO agreement between Coventry and the Cabinet provides that "Covered Services shall be reimbursed at 100 percent of the Medicaid fee schedule/rate until January 1, 2012 and after January 1, 2012, at 90% of the Medicaid fee schedule/rate." (DE 54-2, MCO Agreement, § 29.2.)  At oral argument, the Cabinet's counsel argued that this provision was intended to establish only a "floor, not a ceiling." (DE 321, Tr. at 74.)

Appalachian Regional operates hospitals and other medical facilities that serve citizens in Region 8. *Appalachian Reg'l*, 714 F.3d at 427. Appalachian Regional's patients are generally sicker than other Medicaid patients, meaning it costs MCOs more to provide healthcare for Appalachian Regional's patients. *Id*. at 428. "Initially, when Coventry was establishing its provider network in Region 8, it was told that it had to include Appalachian in its network to meet Kentucky's network-adequacy standards. Coventry assumed its competitors had to do the same, but it was wrong: the Cabinet did not require Kentucky Spirit to do so." *Id*.

This upset Coventry because having to serve Appalachian Regional's relatively costlier patients was causing Coventry to lose money. *Id*. Coventry believed that a disproportionate number of the sicker Eastern Kentucky population joined Coventry so they could receive in-network healthcare from Appalachian Regional. (DE 302, Resp. at 7.) The capitation rate paid by the state did not cover the medical services these patients incurred. *Appalachian Reg'l*, 714 F.3d at 428. This "meant Coventry was disadvantaged relative to a competitor MCO like Kentucky Spirit that was not required to cover—and pay the higher cost of caring for—Appalachian's sicker patients." *Id*.

The agreement between Coventry and Appalachian Regional provided that it would remain in force until the sooner of the execution of a final agreement or June 30, 2012. (DE 278-20, Amendment, ¶1.)  The agreement further provided that either party could terminate it, with or without cause, with 30 days written notice. (DE 278-19, Agreement, ¶17.)  By letter dated March 29, 2012, Coventry notified Appalachian Regional that it was

terminating the temporary agreement effective May 4, 2012. *Appalachian Reg'l*, 714 F.3d at 428. (DE 278-1, Mem. at 10; DE 278-22, Termination Letter.)[1]

Appalachian Regional then filed this action, asserting claims against Coventry, the Cabinet, and CMS. (DE 5, First Amended Compl.; DE 135, Second Amended Compl.)

The only claims at issue on this motion are Appalachian Regional's claims against Coventry.

## II.    Appalachian Regional's claims against Coventry

In its complaint, Appalachian Regional asserts six claims against Coventry:  1) breach of contractual provisions requiring that Coventry promptly pay Appalachian Regional for its services **(Count I)**; 2) violation of certain federal and state laws requiring that MCOs promptly pay healthcare providers for their services **(Count II)**; 3) breach of the contractual covenant of good faith and fair dealing **(Count III)**, 4) violation of the state's "any willing provider laws" **(Count VIII)**; 5)  tortious interference with Appalachian Regional's existing and prospective contractual relationship with Medicaid beneficiaries **(Count IX)**; and 6) outrageous conduct **(Count X)**.

In addition, Appalachian Regional asserts two claims against both the Cabinet and Coventry. First, it asserts that these two parties have conspired to effect an unconstitutional taking of Appalachian Regional's property **(Count V)**.  Second, in its complaint Appalachian Regional asserted an "unjust enrichment" claim against these two parties **(Count VI)**. In later briefs, it has characterized this claim as one under the doctrine

---

[1] At oral argument, Coventry's counsel argued that Coventry did not actually terminate the contract but that instead it let the contract expire on June 30, 2012. (DE 321, Tr. at 66-67.) Nevertheless, by letter dated March 29, 2012, Coventry's Executive Vice President Kevin P. Conlin explicitly stated that "pursuant to Section 17 of the Binding Letter of Agreement. . . notice is hereby given of Coventry's decision to terminate the BLOA. The date of termination is May 4, 2012. . . ." (DE 278-22, Termination Letter.)  Likewise, in its memorandum, Coventry states, "On March 28, 2012, Kevin Conlin, Executive Vice President of Coventry, sent ARH a notice of termination per the terms of the LOA. . . The effective date of the termination was May 4, 2012. . . ." (DE 278-1, Mem. at 10.)

of "quantum meruit." (DE 54, Mem. at 15.) Coventry has also identified this claim as seeking recovery in quantum meruit. (DE 278-1, Mem. at 33-34.) Accordingly, the Court will analyze this as a claim under the doctrine of quantum meruit, not unjust enrichment.

### III. Relevant prior rulings

This case was initially assigned to the late U.S. District Judge Karl Forester. Judge Forester entered several significant opinions ruling on certain of Appalachian Regional's claims. In addition, Appalachian Regional has withdrawn certain claims on its own.

The Court dismissed **Count VIII** (any willing provider) after Appalachian Regional moved to withdraw it. (DE 226, Motion to File Third Amended Compl.; DE 269, Minute Entry; DE 271, Tr. at 9.) In addition, Appalachian Regional agreed that it does not actually assert a claim for the tort of outrage with **Count X**. (DE 271, Tr. at 18.)

Judge Forester has already granted Appalachian Regional summary judgment on certain claims. With **Count V** (unconstitutional taking) of the Complaint, Appalachian Regional sought compensation for emergency healthcare services that it continued to provide to Coventry's members even after Coventry terminated its contract with Appalachian Regional. It asked for a declaration that Coventry and the Cabinet had to pay it "reasonable and fair reimbursements" for emergency services provided to Coventry members and that they had to pay it at least 100 percent of the Cabinet's standard Medicaid rates. (DE 5, Amended Compl., Count V.) Coventry agreed that it was required to pay Appalachian Regional 100 percent of the Medicaid Rate for emergency services it provided to Coventry members. Accordingly, Judge Forester granted Appalachian Regional summary judgment against Coventry on **Count V** (unconstitutional taking) of the complaint. *Appalachian Reg'l Healthcare v. Coventry Health and Life Ins. Co.*, No. 5:12-cv-114, 2013 WL 1314154, at *1 (E.D. Ky. Mar. 28, 2013).

While **Count V** of the Complaint dealt with Appalachian Regional's provision of *emergency* healthcare services after Coventry terminated the parties' contract, **Count VI** deals with Appalachian Regional's provision of *non-emergency* healthcare services to Coventry's members after the contract was terminated. Appalachian Regional asserts that it is entitled to recover the reasonable value of these services under the doctrine of quantum meruit. (DE 5, Compl., Count VI.)

By order dated June 20, 2012, Judge Forester granted Appalachian Regional a preliminary injunction, ordering that the agreement between Coventry and Appalachian Regional would stay in effect until November 1, 2012. *Appalachian Reg'l Healthcare v. Coventry Health and Life Ins. Co.*, No. 5:12-CV-114, 2012 WL 2359439, at *15 (E.D. Ky. June 20, 2012). This meant that Appalachian Regional remained in Coventry's healthcare-provider network until November 1, 2012 and Coventry was required to pay Appalachian Regional the contract rates for services until that date.

Accordingly, the remaining question on Appalachian Regional's quantum meruit claim is how much Coventry should have to pay it for non-emergency healthcare services provided *after* November 1, 2012 to Coventry members who are Medicaid beneficiaries. By order dated March 28, 2013, Judge Forester granted Appalachian Regional summary judgment on this claim and ruled that Coventry must pay Appalachian Regional the "reasonable value" of non-emergency healthcare services rendered after November 1, 2012. *Appalachian Reg'l*, 2013 WL 1314154, at *3-4. Judge Forester declined to determine what that "reasonable value" was, however, finding that any such finding may require an evidentiary hearing and additional discovery. *Id.* (DE 271, Tr. at 7-8.)

Since the injunction expired (and, with it, the contract rate), Coventry has paid Appalachian Regional 90 percent of the Medicaid fee schedule for non-emergency services

provided to Coventry members. (DE 302, Resp. at 10.) With its quantum-meruit claim, Appalachian Regional asserts that the 90-percent rate is not reasonable.

Coventry now moves for summary judgment in its favor on this claim (**Count VI**). It asks the Court to find that the reasonable value of Appalachian Regional's non-emergency healthcare services to Coventry's Medicaid members is 90 percent of the Medicaid rate or, at most, 100 percent of the Medicaid rate.

In addition, Coventry moves for summary judgment in its favor on all the remaining claims asserted against it in the Complaint -- **Count I (breach of contract), Count II (prompt-pay laws), Count III (breach of good faith and fair dealing), and Count IX (tortious interference)**.

## IV. Analysis

### A. Damages under Quantum Meruit (Count VI)

Again, Judge Forester granted Appalachian Regional summary judgment on its quantum meruit claim and ruled that Coventry must pay Appalachian Regional the "reasonable value" of non-emergency healthcare services. *Appalachian Reg'l*, 2013 WL 1314154, at *3-4. The issue now before the Court is what that reasonable value is.

#### 1) A jury must resolve any genuine disputes regarding the "reasonable value" of Appalachian Regional's services.

The parties dispute whether it is the Court or a jury who should determine the reasonable value of the services rendered. Appalachian Regional argues that it has a constitutional right to a jury determination on this issue. The Seventh Amendment right to a jury trial "principally allows an individual to demand a jury when a lawsuit will resolve legal, as opposed to equitable, rights." *Exact Software N. Am., Inc. v. DeMoisey*, 718 F.3d 535, 546 (6th Cir. 2013). The right to a jury trial in this Court is determined by federal law. *Simler v. Conner*, 372 U.S. 221, 222 (1963).

Whether an action involves legal or equitable rights depends upon a two-part inquiry into the nature of the cause of action and the nature of the remedy sought. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989). The Court must (1) compare the nature of the claim to "18th-century actions brought in the courts of England prior to the merger of the courts of law and equity," and (2) evaluate "the remedy sought and determine whether it is legal or equitable in nature." *Id.* (quoting *Tull v. United States*, 481 U.S. 412, 417–18 (1987)). The second inquiry is "more important" than the first. *Id.*

As to the nature of the claim, "[q]uantum meruit provides an avenue of recovery on a contract or quasi-contract by implying the existence of contract where the parties either had no express contract or had abandoned or rescinded it." *Mike Denniston, Inc. v. Commonwealth Transp. Cabinet*, No. 2003-CA-000294-MR, 2004 WL 595229, at *6 (Ky. Ct. App. Mar. 26, 2004). "Claims for quasi-contract arose and developed under the common law writ of assumpsit and, as a result, were historically brought in courts of law." *Fischer Imaging Corp. v. General Electric Co.*, 187 F.3d 1165, 1172 (10th Cir. 1999).

As to the second and "more important" part of the inquiry – the nature of the remedy – Appalachian Regional seeks monetary damages, which are generally considered a legal remedy. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990). There are two exceptions, neither of which is applicable here. The first is where the requested relief is "incidental to or intertwined with injunctive relief" and the second is where the relief sought is restitutionary, such as in "action[s] for disgorgement of improper profits." *Id.* at 571-72.

Appalachian Regional does not seek an injunction. It seeks money damages. As to the second exception, damages under a quantum meruit claim are not restitutionary. They are "based upon a legal fiction implying an obligation to pay reasonable compensation for

services rendered." *JP White, LLC v. Poe Companies, LLC*, No. 2010 –CA-000267, 2011 WL 1706751, at *5 (Ky. Ct. App. 2011). Appalachian Regional does not seek restitution but instead seeks payment for healthcare services it performed. *See Skepnek v. Roger & Twardowsky, LLC*, No. 11-CV-4102, 2015 WL 5178054, at *3 (D. Kan. 2015). Thus, "[d]espite its equitable nature . . . quantum meruit is an action at law—a legal cause of action seeking money damages." *Webb v. B.C. Rogers Poultry, Inc.*, 174 F.3d 697, 704 (5th Cir. 1999).

Accordingly, a jury must resolve any genuine issues of material fact regarding Appalachian Regional's claim for damages under the doctrine of quantum meruit. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.*" Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### 2) There is no evidence that Appalachian Regional has ever received commercial rates for services rendered to Medicaid patients.

Both parties agree that the reasonable market value of services is determined by "measuring the value of services [that] others generally receive for generally similar services." *Vogt Bros. Mfg. Co. v. Stansbury*, 304 S.W.2d 787, 790 (Ky. 1957). That is demonstrated by the "customary fees paid for this general kind of service." *Id*. The central dispute between the parties is what information the factfinder should be permitted to consider in determining the amount that other healthcare providers are paid for healthcare services rendered to Medicaid beneficiaries.

Coventry argues that the fact finder should consider only the amounts healthcare providers are paid for healthcare services rendered to *Medicaid* beneficiaries. Appalachian

Regional argues that the fact finder should also consider other factors like the rates paid by commercial insurers. The undisputed evidence in the record, however, is that healthcare providers have always been paid lower rates for services rendered to Medicaid beneficiaries than for services rendered to individuals who are privately insured.

Coventry expert Mary Beth Edwards stated in her report that Medicaid pays lower reimbursement rates than commercial insurers. (DE 278-15, Edwards Rpt., ¶32(b).) This is because Medicaid is "funded through state and federal budgets and the most common way to control costs is through reducing provider reimbursement." (DE 278-15, Edwards Rep. ¶37.) She further explains that "it is commonly recognized" that providers offset the lower Medicaid rates with higher commercial rates. (DE 278-15, Edwards Rep., ¶32(c).) She opined that the average commercial rate is close to double the Medicaid rate. (DE 278-15, Edward Rep., ¶47.)

Appalachian Regional CEO Joseph Grossman also testified that "Medicaid has historically paid different than the commercial market." (DE 278-5, Grossman Dep. at 347.) He testified that he is not aware of any provider receiving commercial rates to treat Medicaid patients. (DE 278-5, Grossman Dep. at 156.) Grossman testified that Appalachian Regional agrees to different rates depending upon who the payor is. (DE 278-5, Grossman Dep. at 345-46.) For example, Appalachian Regional entered into agreements with Humana/ChoiceCare and Anthem Blue Cross/Blue Shield that provided for reimbursement at about 200 percent of the Medicaid rates for services provided to non-Medicaid beneficiaries. (DE 278-5, Grossman Dep. at 342-44.) Its contracts with those same MCOs provide for reimbursements at 100 percent or less of the Medicaid Fee Schedule for Medicaid beneficiaries. (DE 278-5, Grossman Dep. at 342-44.)

In support of its argument that the fact finder should nonetheless consider the rates paid by commercial insurers in determining the reasonable rate for healthcare services

rendered to Medicaid beneficiaries, Appalachian Regional cites *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501 (Pa. Super. Ct. 2003). The "crux" of that opinion, however, dealt with whether the trial court erred when, after finding that the hospital was entitled to recover under an unjust enrichment claim, it awarded the hospital its published rates for Medicaid services. *Id.* at 508. As will be further discussed below, the Pennsylvania Superior Court ruled that the published rates should not be considered because "the Hospital rarely recovers its published rates." *Id.*

After the court resolved that issue, it stated "[r]easonable value . . . is the value paid by the relevant community." *Id.* at 510. In the last two lines of the opinion, the court then stated, "[t]he relevant community in this case comprises the Hospital's patients who are covered by insurance policies and federal programs. Thus, the Hospital should be awarded the average charge for the services at issue contained in contracts with governmental agencies and insurance companies." *Id.* at 510.

In that case, it does not appear that any party presented evidence of the historical difference between the rates paid by Medicaid and commercial insurers. In the opinion, the court does not discuss any such evidence and does not address any argument that commercial rates should not be considered when determining the reasonable value of Medicaid services.

The same is true for *Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*, 172 Cal. Rep. 3d 861 (Cal. Ct. App. 2014), another case cited by Appalachian Regional. In that case the court stated "[a]ll rates that are the result of contract or negotiation, including rates paid by government payors, are relevant to the determination of reasonable value." *Id.* at 875. That opinion dealt largely with the trial court's conclusion that a state regulation provided the exclusive standard for calculating the reasonable and customary rate for healthcare on the

hospital's quantum meruit claim. *Id*. at 868. Based on that conclusion, the trial court excluded evidence of rates paid by both commercial and government payors, finding they were irrelevant. *Id*.

The Court of Appeals determined that the trial court was wrong in relying exclusively on the regulation and, thus, was also wrong in excluding the amounts paid by both government and commercial payors. *Id*. at 873-875. As with *Temple*, the issue of whether both commercial rates and government rates should be considered in determining the reasonable value of Medicaid services was not specifically addressed.

In the present case, there is no evidence that healthcare providers have ever received commercial rates for healthcare services rendered to Medicaid beneficiaries. Accordingly, the rates paid by commercial insurers should not be considered in determining the reasonable value of the medical services rendered to Medicaid beneficiaries.

### 3) There is no evidence that Appalachian Regional has ever received its published rates for Medicaid services.

Appalachian Regional also argues that, in determining the reasonable value of its medical services, the factfinder should consider its published rates for those services.

As mentioned, the Pennsylvania Superior Court faced a similar argument in *Temple*. It held "the Hospital rarely recovers its published rates. Therefore, those rates cannot be considered the value of the benefit conferred because that is not what people in the community ordinarily pay for medical services." *Temple*, 832 A.2d. at 508. "Under the law, the Hospital is entitled to the reasonable value of its services, i.e., what people pay for those services, not what the Hospital receives in one to three percent of its cases." *Id*. at 509. "The Hospital's contention that it can unilaterally set a price for its services that bears no relationship to the amount typically paid for those services is untenable." *Id*. at 510.

In this case, there is no evidence that Appalachian Regional or any hospital has ever received its published charges for healthcare services rendered to anyone, let alone Medicaid beneficiaries. Accordingly, there is no basis for the factfinder to consider the hospital's published charges in determining the amount that providers customarily receive for Medicaid services.

### 4) The appropriateness of the customary rates or any actions by Coventry that increased Appalachian Regional's costs are irrelevant to determining the reasonable value of Medicaid services.

Appalachian Regional also argues that the factfinder should consider "the volume of patients Coventry sends to" Appalachian Regional and "any barriers to care, such as pre-authorizations, that Coventry imposes, and Coventry's claims payment history." (DE 302, Resp. at 18.) In support of this argument, it cites *River Park Hospital, Inc. v Bluecross Blueshield of Tennessee, Inc.*, 173 S.W.3d 43 (Tenn. Ct. App. 2002).

In that case, the Tennessee Court of Appeals determined that the hospital was entitled to a "reasonable rate of reimbursement for all of the emergency admissions at issue." *River Park*, 173 S.W.3d at 60. It instructed that, in calculating a "reasonable rate," the trial court should consider a host of factors including the MCO's in-network rates, industry custom, and any other pertinent factor, "such as whether the rate for in-network providers is appropriate for out-of-network providers, given the difference in the volume of [the MCO's] enrollees treated," and "factors that increase the provider's costs, such as [the MCO's] repeated automatic disallowance of claims previously authorized, apparently onerous and costly appeal and approval procedures, and delays in payment." *Id*.

That case dealt with damages on an unjust enrichment claim under Tennessee law. There is no dispute, however, that, in Kentucky, damages on a quantum meruit claim are determined by "the value of services [that] others generally receive for generally similar

services," which is demonstrated by the "customary fees paid for this general kind of service." *Vogt Bros.*, 49 S.W.3d at 790. The appropriateness of the rates that are customarily paid and any actions by the MCO that increase the provider's costs are irrelevant.

**5) The rate that providers customarily receive for rendering Medicaid services is, at most, the Medicaid rate.**

Thus, the reasonable rate for Appalachian Regional's healthcare services to Medicaid patients is the amount that is customarily paid to healthcare providers for rendering healthcare services to Medicaid beneficiaries. At most, this is the Medicaid rate established by the state pursuant to Section 30(a) of the Medicaid Act. 42 U.S.C. § 1396a(a)(30)(A).

From the inception of Kentucky's Medicaid program in 1966 to the switch to the MCO system in 2011, the rates paid to Kentucky healthcare providers for services rendered to Medicaid patients were set by the state's Medicaid fee schedule. That schedule was developed pursuant to Section 30(A) of the Medicaid Act, which requires state Medicaid plans to provide for payments to healthcare providers that are "'consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers,' to assure 'care and services' equivalent to that 'available to the general population in the geographic area.'" *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1388 (Mar. 31, 2015) (Breyer, J., concurring) (quoting 42 U.S.C. § 1396a(a)(30)(A)). From 1966 until the switch to managed care in 2011, Appalachian Regional accepted 100 percent of the Medicaid rates for services rendered to Medicaid beneficiaries. (DE 278-5, Grossman Dep. at 76, 162-63.)

Under the managed-care system, with regard to *emergency* medical services rendered to Medicaid beneficiaries, as discussed, a federal statute mandates that providers

who are not under contract with an MCO must accept no more than 100 percent of the Medicaid fee schedule. 42 U.S.C. § 1396u-2(b)(2)(D).

Regarding *non-emergency* services under the managed-care system, Coventry's expert Edwards opines that the prevailing rate for non-emergency healthcare services is 100 percent or less of the Medicaid rate. (DE 278-15, Edwards Rep., ¶ 53.) She bases this opinion on a review of the four contracts Appalachian Regional had with MCOs other than Coventry. (DE 278-15, Edwards Rep., ¶¶ 53-55.) Edwards states that, since March 1, 2013, Appalachian Regional has accepted 100 percent or less of the Medicaid rate for non-emergency healthcare services. (DE 278-15, Edwards Rep., ¶ 56.) Appalachian Regional itself states in its response that its contracts with other MCOs "pay between 97 percent and 100 percent of the Medicaid fee schedule." (DE 302, Resp. at 22.) At oral argument, Appalachian Regional's counsel conceded that the highest rate Appalachian Regional is receiving for treatment of Medicaid patients is 100 percent of the Medicaid rate. (DE 321, Tr. at 83-84.)

Coventry also presents a chart detailing the rates it has paid hospitals for Medicaid services since the switch to managed care in November 2011. (DE 278-17, Chart.) The chart shows that the prevailing rate that Coventry has paid for in-network Medicaid services in Kentucky for the period after the injunction expired is 100 percent of the Medicaid rate.

Appalachian Regional argues that the prevailing in-network rate should be considered the *minimum* reasonable rate for its services, not the maximum. It argues that MCOs actually pay less to their providers who are under contract than they do to out-of-network providers. It argues that "'in-network' rates are lower than out-of-network rates because of the benefits conferred on the provider by having a contract with a payor." (DE 302, Resp. at 22.)

As evidence for this assertion, it cites the report of its expert Dr. Gregory A. Culley. On the pages cited, Dr. Culley states, "providers are willing to give to an insurer, whether commercial or Medicaid managed care, a better rate if they can be assured of receiving the benefits of being an in-network provider in exchange." (DE 291-16, Culley Rebuttal at CM-ECF p. 6.) Dr. Culley further states, "[a] provider who is out of network with an MCO is typically required to obtain pre-authorization for services." (DE 291-16, Culley Rebuttal at CM-ECF p. 8.) He further explains that the pre-authorization requirement causes many negative consequences for the provider like delays and the opportunity for the MCO to send the patient to another provider. It presents "not only an additional cost to providers, but causes damage to the provider-patient relationship . . . ." (DE 291-16, Culley Rebuttal at CM-ECF p. 8.)

To the extent that Dr. Culley asserts that the rates that MCOs and providers agree to are lower than what MCOs pay their out-of-network providers, there is no evidence in this record to support that assertion. Instead, the evidence shows that, since the MCO system began in 2011, Appalachian Regional's contract rates for Medicaid services have always been higher than its out-of-network rates. Again, Appalachian Regional itself asserts that its other MCO contracts contained rates between 97 and 100 percent of the Medicaid fee schedule. There is no evidence that any MCO customarily paid more than 100 percent of the Medicaid fee schedule to providers who were out of their network.

In fact, the only evidence on this issue shows that, where there is no contract between the parties, MCOs pay healthcare providers 90 percent of the Medicaid rate for rendering non-emergency healthcare services to Medicaid beneficiaries. There is no evidence of healthcare providers paying any other rate for such services. Kentucky Spirit – the only other MCO that Appalachian Regional had no contract with – paid Appalachian Regional 90 percent of the Medicaid fee schedule for non-emergency, healthcare services

18

rendered to Medicaid beneficiaries. (DE 278-15, Edwards Rep. ¶ 48(d); DE 321, Tr. at 55.) Coventry's corporate representative Michael Murphy testified that it typically pays all out-of-network providers 90 percent of the Medicaid Fee Schedule. (DE 278-8, Murphy Dep. at 77; DE 278-15, Edwards Rep. ¶¶ 48(c), 52.) The other two initial MCOs – WellCare and Kentucky Spirit – also reimbursed out-of-network providers at 90 percent of the Medicaid rate for non-emergency services. (DE 278-15, Edwards Rep. ¶ 50.)

Appalachian Regional expert Dr. Culley testified that he had no knowledge of any out-of-network hospital in Kentucky being paid anything other than 90 percent of the Medicaid Fee Schedule for non-emergency services rendered to Medicaid beneficiaries. (DE 278-3, Culley Dep. at 31, 47-48, 57-58.) Coventry Expert Edwards opines that the prevailing market rate for out-of-network non-emergency hospital services in Kentucky is 90 percent of the Medicaid fee schedule. (DE 278-4, Edwards Dep. at 164, 181; DE 278-15, Edwards Rep. ¶48.) Her opinion is based on the rates actually paid by Coventry, WellCare, and Kentucky Spirit. (DE 278-4, Edwards Dep. at 180; DE 278-15, Edwards Rep. ¶¶ 50, 52.) She testified that Appalachian Regional has never received more than 90 percent for such services. (DE 278-4, Edwards Dep. at 181.)  For non-emergency services, the MCO agreement between Coventry and the Cabinet requires that Coventry pay out-of-network providers 100 percent of the Medicaid rate until January 1, 2012 and, after that, 90 percent of the Medicaid rate. (DE 54-2, MCO Agreement, § 29.2.)

As evidence that the contract rate is actually lower than the out-of-network rate, Appalachian Regional also cites a law review article by George A. Nation III. (DE 302, Resp. at 22, n.101.) At the page cited by Appalachian Regional, Nation discusses why hospitals charge insurers, including the government, lower rates than they charge individuals for healthcare.  George A. Nation III, *Determining the Fair and Reasonable Value of Medical Services: The Affordable Care Act, Government Insurers, and Uninsured*

*Patients*, 65 Baylor L. Rev. 425, 450 (2013). These advantages include an increased volume of business, "easy and quick" payments "from the insurance company or government," and the marketing benefits from being listed as a "network" hospital for a private insurer. *Id.* While Nation explains why insurance companies and the government are charged less than individuals, he does not assert that MCOs customarily pay their in-network providers less than their out-of-network providers for Medicaid services. There is simply no evidence of that in the record.

Appalachian Regional argues that the contract rate of 100 percent of the Medicaid rate should not be considered the customary rate paid for Medicaid services because hospitals were under duress when they agreed to these rates. As evidence it cites its own experience with MCO WellCare. Appalachian Regional's contract with WellCare provided for a rate of 97 percent of the Medicaid inpatient rate and 100 percent of the Medicaid outpatient rate. (DE 291-14, Grossman Dep. at 157.) CEO Grossman testified that he felt the hospital had to agree to those rates because otherwise WellCare enrollees in Region 8 would have been required to travel to another provider for essential services or Appalachian Regional would have been required to treat Medicaid patients as an out-of-network provider. (DE 291-14, Grossman Dep. at 157-58.)

Mr. Grossman also testified, however, that Appalachian Regional accepted 100 percent of the Medicaid fee schedule for all other MCOs without feeling any compulsion. (DE 291-14, Grossman Dep. at 160.) Furthermore, Appalachian Regional submits no evidence of any other provider feeling compelled to agree to the 100-percent rate. Most importantly, however, in determining damages on a quantum meruit claim, there is no legal basis for this Court to discount the customary payments on the basis that the recipients felt compelled to accept the payments or were otherwise not happy with the payments they accepted.

Appalachian Regional also argues that the customary contract rate is actually higher than 100 percent of the Medicaid fee schedule. It points solely to its own contract with Coventry which provided for payments at 107.5 percent of the Medicaid rates. The question here, however, is what the *customary* rate is. Coventry has produced undisputed evidence that the prevailing contract rate in Kentucky for non-emergency Medicaid services is 100 percent of the Medicaid fee schedule. That is also the mandatory maximum rate for emergency services. Pursuant to *Vogt*, the most that Coventry is entitled to on its quantum meruit claim is 100 percent of the Medicaid rate.

At oral argument, when asked why Appalachian Regional should be awarded more than the Medicaid rate when the sole evidence establishes that, since the inception of Medicaid, the rates customarily provided to healthcare providers has been the Medicaid rate, counsel for Appalachian Regional stated that "Medicaid rates are not reasonable in themselves. . . ." (DE 321, Tr. at 33.) Again, however, the question on a quantum meruit claim is what the customary payments are for the services at issue. The law assumes that the customary rate is a reasonable rate. There is no exception for Medicaid cases or any other kind of case that permits this Court or a jury to analyze the customary payments to determine if they are indeed reasonable given the costs of the recipient.

Finally, the Supreme Court's decision in *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015) prevents this Court from assessing whether a state's Medicaid rates are unreasonable. In that case, a group of healthcare providers sued state officials charged with administering Idaho's Medicaid program. The providers alleged that the state had violated Section 30(A) of the Medicaid Act by setting Medicaid rates that were too low. As discussed, that provision requires the state to develop a Medicaid plan that will include an adequate method of paying providers for healthcare.

Specifically, it requires the state plans to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area. . . .

42 U.S.C. § 1396a(a)(30)(A).

The Court determined that providers have no private right of action to judicially enforce Section 30(A). *Armstrong*, 135 S. Ct. at 1385. It held that "the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements . . . is the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id.* (citing 42 U.S.C. § 1396c).

In his concurrence, Justice Breyer recognized that setting Medicaid rates involves determinations like:

1) the actual cost of providing quality services, including personnel and total operating expenses;
2) changes in public expectations with respect to delivery of services;
3) inflation;
4) a comparison of rates paid in neighboring States for comparable services; and
5) a comparison of any rates paid for comparable services in other public or private capacities.

*Armstrong*, 135 S. Ct. at 1388 (Breyer, J. concurring). Moreover, "States engage in time-consuming efforts to obtain public input on proposed plan amendments." *Id.*

The Supreme Court determined that the fact that the statute explicitly confers enforcement of Section 30(A)'s "judgment-laden standard" upon the Secretary alone establishes Congress's intent to "'make the agency remedy that it provided exclusive,' thereby achieving 'the expertise, uniformity, widespread consultation, and resulting

administrative guidance that can accompany agency decisionmaking,' and avoiding 'the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action.'" *Id*. (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 292 (2002)).

In his concurrence, Justice Breyer explained that permitting courts to engage in rate setting could result "in rates set by federal judges (of whom there are several hundred) outside the ordinary channel of federal judicial review of agency decisionmaking." *Id*. at 1389. The result would be "increased litigation, inconsistent results, and disorderly administration of highly complex federal programs that demand public consultation, administrative guidance and coherence for their success." *Id*. For these reasons, "administrative agencies are far better suited" to ratemaking than judges. *Id*. at 1388.

The sole evidence here is that the maximum rate that providers are customarily paid for rendering healthcare services to Medicaid beneficiaries is the Medicaid rate. There is no legal basis under Kentucky's quantum meruit law for this Court to analyze whether those rates are reasonable in light of the healthcare provider's costs or any other factors. Further, the Court is prohibited from doing so under *Armstrong*.

6) **Factual issues exist regarding whether Appalachian Regional is entitled to additional amounts.**

Pursuant to the injunction entered by Judge Forester, Coventry was obligated to pay Appalachian Regional the contract rate (107.5 percent of the Medicaid rate) for healthcare services rendered until the injunction expired on November 1, 2012. *Appalachian Reg'l*, 2012 WL 2359439, at *14, 15. As discussed, Appalachian Regional is entitled to at most 100 percent of the Medicaid rate for the healthcare services it provided after the injunction ended.

There is no dispute that, since the injunction expired, Coventry has only been reimbursing Appalachian Regional at 90 percent of the Medicaid rate for non-emergency healthcare. (DE 302, Resp. at 10.) Nevertheless, Coventry asserts that, even if it should be determined that Coventry owed Appalachian Regional the maximum 100 percent of the Medicaid rate for these services, Appalachian Regional cannot prove any damages. This is because Coventry asserts that it overpaid Appalachian Regional on 462 mental health in-patient claims while the contract rate was in effect (through the end of the injunction period) and that this overpayment must be deducted from any amounts it may owe for healthcare services provided after the injunction expired.

As evidence, Coventry cites a document it identifies as "Emdeon Spreadsheet" and the deposition testimony of Bryan Hufnagle, who is vice president of operations at Emdeon. (DE 278-6, Hufnagle Dep. at 7, 8.) Appalachian Regional retained Hufnagle as an expert in this matter. (DE 278-6, Hufnagle Dep. at 7.) Hufnagle testified that Emdeon is a "health care information technology firm that specializes in many different aspects of health care." (DE 278-6, Hufnagle Dep. at 8.) He testified that his duties at Emdeon relate to "underpayments, denial, and [accounts receivable] recovery services." (DE 278-6, Hufnagle Dep. at 8.)

At oral argument, counsel for Appalachian Regional explained that Emdeon is a "collection agency." (DE 321, Tr. at 30.) He further explained that Appalachian Regional submits all claims to Emdeon who then, "in the normal course of business," determines the amount that the hospital should receive for each claim based upon the contract rate – if a contract exists – or the Medicaid rate. (DE 321, Tr. at 30-32.)

The Emdeon Spreadsheet lists the 462 mental-health claims with columns of information about each claim including the admit date, the discharge date, total payments, and "original expected." (DE 278-26, Emdeon Spreadsheet.) The Court assumes from the

arguments in the briefs and at the hearing that the "original expected" is the amount that Appalachian Regional expected to be paid on each claim. (DE 278-6, Hufnagle Dep. at 66.)

It appears from Hufnagle's deposition and the arguments in the parties' briefs and at the hearing that Coventry's counsel prepared the spreadsheet but that the data in it, including the over- and under-payment column, was produced by Emdeon. The only information added by Coventry itself was a row at the bottom of the spreadsheet totaling each column including the "original expected," the amounts paid by Coventry, and the total overpayment. It calculates that Coventry paid Appalachian Regional $3,375,503.18 on these claims and that the "original expected" was $2,582,596.89, for a total overpayment of $792,916.19. (DE 278-6, Hufnagle Dep. at 69-70.) Hufnagle stated in his deposition that, if these totals were calculated based on Emdeon's data, he would not dispute the totals. (DE 278-6, Hufnagle Dep. at 69, 72.)

Coventry expert Edwards calculated the amount that Coventry would owe Appalachian Regional for all claims if it should have paid 107.5 percent of the Medicaid rate for claims through the injunction period and 100 percent for claims after the injunction expired. She then deducted the alleged $792,916 overpayment from this total and determined that Coventry has overpaid Appalachian Regional $18,442. (DE 278-15, Edwards Rep. ¶71(d)).

In its response, Appalachian Regional does not dispute any of the data contained in the Emdeon spreadsheet or the totals calculated by Coventry. Nor does Appalachian Regional dispute that, if Coventry did overpay it on the psychiatric claims, that overpayment should be deducted from any amount owed on the quantum meruit claim. Appalachian Regional did argue, however, that the 462 claims were arbitrarily "hand-picked" by Coventry. (DE 302, Resp. at 29.)

At oral argument, Appalachian Regional's counsel produced two charts purporting to detail *all* psychiatric claims submitted by Appalachian Regional to Coventry. One chart purports to show underpayments by Coventry and another purports to show overpayments. (DE 321, Tr. at 97-99.) Appalachian Regional argued that these charts represent a "complete data set of psychiatric claims" and not the "partial data set" submitted by Coventry. In total, the charts show an underpayment of $1,351,523. (DE 321, Tr. at 102.)

The Court cannot consider these charts on this summary judgment motion. They were not produced until after briefing on the summary judgment motions had closed. Thus, Coventry was unable to respond to them in the briefing. Further, the charts were produced at the hearing with no advance notice. Thus, Coventry was unable to respond to them at the hearing.

Nevertheless, the alleged $18,442 overpayment is an affirmative defense and Coventry must submit adequate evidence to prove it. The Emdeon spreadsheet may show that Coventry overpaid Appalachian Regional on 462 psychiatric claims while the contract rate was in effect. It does not, however, even purport to prove that Coventry overpaid Appalachian Regional when all the claims submitted by Appalachian Regional to Coventry are considered. In addition, neither party has addressed whether Coventry provided Appalachian Regional the proper notice regarding any overpayments. *See, e.g.*, KRS § 304.17A-714.

Appalachian Regional is correct that the only thing Coventry proves with the Emdeon spreadsheet is an overpayment on the 462 claims depicted. A factual dispute remains regarding whether, when evidence of all the claims between the parties is considered, Coventry owes Appalachian Regional any money. A jury must determine this issue and must also determine the reasonable value of Appalachian Regional's services after the injunction expired. To assist the jury in resolving that issue, the parties will be

permitted to submit evidence of the amounts customarily paid to healthcare providers for healthcare services rendered to Medicaid beneficiaries. As discussed, Coventry has established as a matter of law that, at most, the customary rate is 100 percent of the Medicaid rate.

## B. Breach of contract and violation of state and federal "prompt-pay" laws (Counts I and II)

In its complaint, Appalachian Regional alleges that Coventry breached the agreement between the parties by failing to promptly pay claims. (DE 5, Compl., ¶ 95.) In response to Coventry's motion for summary judgment and in its answers to interrogatories (DE 236-2, Supp. Resp. Interrog. 8), Appalachian Regional clarifies that its prompt-pay claim against Coventry is based only on a state statute providing that "each insurer shall reimburse a provider for a clean claim or send a written or an electronic notice denying or contesting the claim within thirty (30) calendar days from the date that the claim is received by the insurer or any entity that administers or processes claims on behalf of the insurer." KRS § 304.17A-702(1).

The remedy that Appalachian Regional seeks with this claim is interest on any amounts that Coventry failed to pay within the 30 days required under the statute. A second state statute requires that an insurer that fails to "pay, deny, or settle a clean claim" as required must pay interest. KRS § 304.17A-730. Coventry does not dispute that the claims at issue are "clean claims" as that term is defined under the statutes.

In its interrogatory answers, Appalachian Regional clarified that this claim is based on Coventry's alleged failure to pay the correct amounts on three types of claims. (DE 236-2, Supp. Resp. Interrog. 8.) The first set of claims consists of claims for *emergency* services provided after the contract rate expired for which Coventry did not pay 100 percent of the Medicaid rate. As discussed, at some point, Coventry agreed to pay Appalachian Regional

100 percent of the Medicaid rate for emergency services. In its response, Appalachian Regional does not mention emergency services when discussing its prompt-pay claim. Accordingly, it appears that Appalachian Regional no longer asserts that Coventry violated the prompt-pay statute by failing to pay it for emergency services it rendered to Coventry's members after the contract rate expired.

The second set of claims consists of the claims for *non-emergency* services provided by Appalachian Regional after the contract rate expired. These are the same claims that form the basis for Appalachian Regional's quantum meruit claim. There is no dispute that Coventry has been paying 90 percent of the Medicaid rate on these claims. As discussed, Judge Forester determined that Appalachian Regional is entitled to the "reasonable value" of these services and, with this opinion, the Court finds that the reasonable value is, at most, 100 percent of the Medicaid fee schedule.

Coventry argues that it cannot be held to have violated the state prompt-pay statute on these claims because the amount it owes, if any, has yet to be determined. Nevertheless, the statute requires that an insurer take some action upon its receipt of a clean claim. The insurer can either reimburse the provider or send a written or electronic notice denying or contesting the claim within 30 days. KRS § 304.17A-702. Thus, Coventry was required to do one of these three things upon receipt of the claim.

It is unclear how much Appalachian Regional billed Coventry for each claim but it is clear that Coventry paid Appalachian Regional less than the amount billed. Coventry was permitted to do this under the statute if it also notified Appalachian Regional electronically or in writing of the reasons any portion of the claim would not be paid. KRS § 304.17A-702(2). In its motion, Coventry does not assert that it provided such notification to Appalachian Regional. Accordingly, its motion for summary judgment on this portion of its prompt-pay claim must be denied.

Appalachian Regional argues that, even if Coventry did adequately deny claims within the 30-day time period, it still owes interest on any claim it wrongfully denied. For this argument, it cites another statute which provides, "[w]hen paying a claim after the time required by KRS 304.17A-702, the insurer shall add the interest payable to the amount of the unpaid claim. . . ." KRS § 304.17A-730(2). Appalachian Regional argues that this statute means an insurer must pay interest *anytime* it pays a claim after the 30-day time period specified in KRS § 304.17A-702. Thus, it argues, if Coventry denies or contests a claim within the 30-day period but it is later determined that Coventry does owe the claim, then it must pay interest on the amounts owed. Coventry, on the other hand, argues that it does not owe interest on any claim as long as it paid, denied or contested a claim within the 30-day window.

In construing a statute, this Court must begin "by examining the language of the statute itself to determine if its meaning is plain." *Ford Motor Co. v. United States*, 768 F.3d 580, 587 (6th Cir. 2014) (quoting *Nat'l Air Traffic Controllers Ass'n v. Dep't of Transp.*, 654 F.3d 654, 657 (6th Cir. 2011)). "Plain meaning is examined by looking at the language and design of the statute as a whole." *Id.*

The Court will begin with the language of the statute that Appalachian Regional asserts that Coventry violated. It provides that each insurer must "reimburse a provider for a clean claim or send a written or an electronic notice denying or contesting the claim" within 30 days from the date the claim is received. KRS § 304.17A-702(1). Under its plain language, an insurer complies with this statute if it does one of three things within the 30-day window: reimburses the provider, denies the claim, or contests the claim. Subsection 2 of the statute makes this even more clear, specifically providing:

Within the applicable claims payment time frame, an insurer shall:

    (a) Pay the total amount of the claim in accordance with any contract between the insurer and the provider;

    (b) Pay the portion of the claim that is not in dispute and notify the provider, in writing or electronically, of the reasons the remaining portion of the claim will not be paid; or

    (c) Notify the provider, in writing or electronically, of the reasons no part of the claim will be paid.

KRS § 304.17A-702(2). *See also Premiertox 2.0, Inc. v. Coventry Health & Life Ins. Co.*, No. 1:15-CV-00127, 2016 WL 1421002, at *4 (W.D. Ky. Apr. 8, 2016) (rejecting plaintiff's claim that Coventry violated the statute because it did not pay for services performed within the 30-day deadline imposed by KRS § 304.17A-702 and finding, "[t]his interpretation misconstrues the plain language of the statute. Specifically, that statute states that an insurer violates [this] provisions only when the insurer takes *no* action.)

    As to the interest provision, it provides that "[a]n insurer that fails to *pay, deny, or settle* a clean claim in accordance with KRS 304.17A-700 to 304.17A-730 and KRS 205.593, 304.14-135, and 304.99-123 shall pay interest . . . ." KRS § 304.17A-730(1)(emphasis added). Again, the language is clear that interest is owed only when an insurer fails to perform one of the three specified acts: pay, deny, *or* settle a claim within the 30-day time period. The insurer does not necessarily violate the statute by failing to pay a claim within the 30-day period.

    Appalachian Regional relies on part 2 of the interest provision which provides that, "[w]hen paying a claim after the time required by KRS 304.17A-702, the insurer shall add the interest payable to the amount of the unpaid claim without the necessity for any claim for that interest to be made by the provider filing the original claim." KRS § 304.17A-730(2). Appalachian Regional argues that this provision means that an insurer must pay interest anytime it pays a claim after the 30-day window. Thus, even where the insurer

denies a claim in the 30-day time period, if it is later determined that the insurer should have paid the claim, it must pay interest on amounts owed.

We "must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Ford Motor Co.*, 768 F.3d at 587 (quoting *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998)). In order to give effect to the instructions in part 1 of KRS § 304.17A-730 that interest is due only when an insurer fails to *pay, deny or settle* a claim within the 30-day time period, part 2 must be read to provide that when an insurer does nothing – fails to pay, deny, or settle a claim – within the 30-day time period, then it must pay interest on amounts it owes without requiring that the provider request that interest.

This is made even more clear by the second sentence in part 2 which refers to the "[t]he interest obligation" that applies where there is a "failure to pay, deny, *or* settle a claim. . . ." KRS § 304.17A-730(2) (emphasis added).

Appalachian Regional argues that, if the statue is not read to provide that an insurer owes interest when it wrongfully denies a claim at first and then pays later, there is nothing to prevent an insurer from always initially and wrongfully denying claims. An insurer is subject to substantial fines, however, each day that a clean claim remains unpaid and even greater fines for a pattern of violations. KRS § 304.99-123.

The third set of claims that form the basis of Appalachian Regional's prompt-pay claim is made up of claims payable *while the agreement was in force* that were not timely paid in full. The total payments from Coventry to Appalachian Regional while the contract rate was in force were nearly $20 million. (DE 278-5, Grossman Dep. at 132.) Appalachian Regional alleges that Coventry underpaid it by a total $57,820. (DE 278-5, Grossman Dep. at 132.)

With regard to these claims, there is no dispute that Coventry did not deny or contest any portion of the claim. It simply paid Appalachian Regional the wrong amount under the contract. Coventry argues that this claim fails because it overpaid on the 462 mental health claims discussed above. Again, the alleged overpayment was $792,916. The underpayments allegedly total $57,820. There are issues of fact, however, regarding whether Coventry actually overpaid Appalachian Regional and by how much.

Coventry next argues that, even if it did underpay Appalachian Regional, the hospital is not entitled to interest on these claims under KRS § 304.17A-730 because a state regulation provides that an insurer need not pay interest so long as it makes "corrected payments" within 30 days of "receipt of documentation from the provider verifying the error." 806 KAR 17:360, §4(4). *See also* KRS § 304.17A-708(1).

Coventry does not argue that it made the corrected payments but argues that Appalachian Regional has not sent it the proper documentation regarding unpaid claims, and, therefore, its obligation to pay interest has not been triggered. In its response, Appalachian Regional argues only that the statute is inapplicable because it applies only to "miscalculations" and Coventry has not proved that the $57,820 in underpayments were caused by "miscalculations."

In his deposition, however, Appalachian Regional representative Grossman confirmed that it is Appalachian Regional's contention that Coventry underpaid it by $57,820 because of "miscalculations" of amounts due under the agreement. (DE 278-5, Grossman Dep. at 134.) In its response, Appalachian Regional puts forth no other theory regarding the reasons for the underpayment.

Accordingly, Appalachian Regional was required to provide Coventry documentation verifying the errors in payment. It does not allege that it provided that documentation.

Thus, Coventry will not be required to pay interest on any underpayments while the contract was in force.

### C. Breach of the Covenant of Good Faith and Fair Dealing (Count III)

"Within every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank & Tr. Co. of Georgetown v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005). In its complaint, Appalachian Regional asserted that Coventry violated the implied covenant in a variety of ways. In response to Coventry's motion, however, it argues only that Coventry violated the covenant "by noticing the termination of its contract with [Appalachian Regional]. . . because it needed to prop up its bottom line." (DE 302, Resp. at 36.)

The covenant of good faith and fair dealing does not "prevent a party from exercising its contractual rights." *Farmers Bank*, 171 S.W.3d at 11. The agreement between the parties explicitly provided that either party could terminate it "for any reason, with or without cause . . . by providing 30 day's prior written notice to the other party." (DE 278-19, Letter Agreement § 17.) There is no dispute that Coventry provided the required notice when terminating the agreement. Thus, Appalachian Regional's claim for breach of the implied covenant of good faith and fair dealing must be dismissed.

### D. Tortious Interference (Count IX)

In its complaint, Appalachian Regional asserted a claim for tortious interference with existing and prospective contractual relationships and Medicaid beneficiaries. (DE 5, Amended Compl. ¶¶ 138-41.) A claim of tortious interference with a contractual relationship requires Appalachian Regional to prove that Coventry intended to cause a party to breach a contract with Appalachian Regional and a subsequent breach of that

contract. *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012). This claim fails because Appalachian Regional does not even allege any such breach.

A claim for interfering with a prospective contractual relationship requires Appalachian Regional to prove that Coventry intentionally and improperly interfered with Appalachian Regional's valid business relationship or expectancy, and that the interference caused damages. *Id.*

In response to Coventry's motion for summary judgment, Appalachian Regional asserts that this claim is based on "Coventry's very act of cutting [Appalachian Regional] from Coventry's network." (DE 302, Resp. at 33.) It asserts that Coventry's termination of the Appalachian Regional contract interfered "with Appalachian Regional's existing and prospective contractual relationships with Medicaid beneficiaries in Eastern Kentucky." (DE 302, Resp. at 33.)

As discussed, Coventry had a contractual right to terminate the agreement at any time. Under Kentucky law, its exercise of that right cannot constitute tortious interference. *Hunt Enter., Inc. v. John Deere Indus. Equipment Co.*, 18 F. Supp. 2d 697, 703 (W.D. Ky. 1997) (citing *Nat'l Collegiate Athletic Assoc. v. Hornung*, 754 S.W.2d 855 (Ky. 1988)), *aff'd*, No. 97-6048, 162 F.3d 1161 (6th Cir. 1998) (unpublished).

Furthermore, Coventry's termination of the contract did not prevent any Medicaid beneficiary from receiving treatment at Appalachian Regional. The plaintiff claims that "[b]y cutting [Appalachian Regional] from its network, Coventry was in essence, encouraging its members to enroll with other health plans that had [Appalachian Regional] in their network." (DE 302, Resp. at 35.) If the former Coventry members did switch to MCOs *with Appalachian Regional in their network*, then those members were certainly not prevented from obtaining treatment at Appalachian Regional.

Further, even those Medicaid beneficiaries who remained with Coventry could continue to receive treatment from Appalachian Regional after Coventry terminated the parties' contract. Appalachian Regional would simply render any such services as an out-of-network provider.Appalachian Regional points to no evidence that any Medicaid beneficiary was prevented from receiving treatment at Appalachian Regional because Coventry terminated its contract with Appalachian Regional. It does not submit evidence of any lost business as a result of the termination.

Instead, Appalachian Regional asserts its damages consist of $14,000 it spent educating Coventry members about their right to switch MCOs to continue receiving care at Appalachian Regional. These costs, however, were not caused by Coventry's interference with Appalachian Regional's existing or prospective business relationships. Instead, they were caused by Appalachian Regional's termination of the contract. As discussed, the agreement explicitly granted either party the right to terminate the contract at any time.

Because Appalachian Regional has not presented any evidence that any individual was unable to obtain treatment at Appalachian Regional after Coventry terminated the contract, it cannot prove interference with either existing or prospective business relations. Nor can it prove any damages on this claim. Accordingly, the tortious interference claim must be dismissed.

Because Appalachian Regional's only tort claims – tortious interference and breach of the covenant of good faith and fair dealing – must be dismissed, Appalachian Regional's claim for punitive damages must also be dismissed. *See Russell v. Rhodes*, Nos. 2003–CA–000923–MR, 2004–CA–000492–MR, 2005 WL 736612 at *5 (Ky. Ct. App. Apr. 1, 2005) (holding that it is proper to dismiss claims for punitive damages when all underlying tort claims are dismissed).

### E. Network Adequacy

Coventry also moves for summary judgment on any claim that it has violated federal law requiring that each MCO provide both the state and the Secretary of Health and Human Services with adequate assurances that it has maintained an adequate network. Appalachian Regional argues that it asserts this claim against only the Cabinet. (DE 321, Tr. at 42, 44, 112; DE 278-5, Grossman Dep. at 248.) At oral argument, Coventry agreed. (DE 321, Tr. at 71.)

Accordingly, the Court will address this claim in its opinion on the motions for summary judgment filed by Appalachian Regional and the Cabinet regarding the claims against the Cabinet.

### V. Conclusion

For all these reasons, the Court hereby ORDERS that the motion for summary judgment filed by Coventry (DE 278) is GRANTED in part and DENIED in part as follows.

A.  The motion is GRANTED as to Coventry's motion requesting that the Court find that the most that Appalachian Regional is entitled to in quantum meruit on non-emergency healthcare services rendered by it to Coventry's members after the injunction (and, thus, contract rate) expired is 100 percent of the Medicaid rate;

B.  the motion is GRANTED as to Appalachian Regional's claim for interest under KRS § 304.17A-702 (prompt pay) with regard to claims for emergency services Appalachian Regional provided after the contract rate expired and with regard to the alleged underpayment of $57,820 for claims payable while the agreement was in force and those claims are DISMISSED;

C.  the motion is GRANTED as to Appalachian Regional's claims that Coventry breached the covenant of good faith and fair dealing and that Coventry tortiously

interfered with Appalachian Regional's existing and prospective contractual relationships and as to Appalachian Regional's claim for punitive damages and those claims are hereby DISMISSED;

D.   Coventry's motion for summary judgment is otherwise DENIED; and

E.   because this opinion and order discusses matters that the parties filed under seal, this opinion and order SHALL BE FILED UNDER SEAL.

As a result of this and prior opinions, the sole issues remaining to be tried against Coventry are the reasonable value of Appalachian Regional's non-emergency services rendered to Coventry members after the contract rate expired and Appalachian Regional's claim for interest on those same claims under KRS § 304.17A-702 (prompt pay) and KRS § 304.17A-730.

Dated September 30, 2016.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY