UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION – LEXINGTON

| | |
|---|---|
| **APPALACHIAN REGIONAL HEALTHCARE, INC., et al.,**<br><br>**Plaintiff,**<br><br>V.<br><br>**COVENTRY HEALTH AND LIFE INSURANCE CO., et al.,**<br><br>**Defendants.** | **CIVIL ACTION NO. 5:12-114-KKC**<br><br><br>**OPINION AND ORDER** |

This matter is before the Court on the motions for summary judgment (DE 280) filed by defendants Commonwealth of Kentucky, Cabinet for Health and Family Services and Audrey Haynes in her official capacity as Cabinet Secretary (collectively, the "Cabinet") and on the motion for summary judgment filed by the plaintiffs. (DE 279).

**I.   Background**

The plaintiffs – referred to collectively as Appalachian Regional – provide healthcare in Kentucky. With their complaint, they challenge certain actions by the state and federal governments and a private managed care organization in the administration of Kentucky's Medicaid program.

The purpose of that program is to provide government funding for medical care of individuals who cannot afford to pay for that care on their own. *Arkansas Dept. of Health and Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). Through the program, the federal government provides funds to help states deliver healthcare to their needy citizens. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990).

The Department of Health and Human Services is the federal agency that administers the program. *Ahlborn*, 547 U.S. at 275. It does so through the Centers for Medicare and Medicaid Services (CMS). *Id*. The Court will refer to the federal department and CMS collectively as CMS in this opinion. The Kentucky Cabinet for Health and Family Services is the state agency that administers Kentucky's Medicaid program. KRS §§ 194A.010(1), 194A.030(2). CMS and the Cabinet are both defendants in this action.

To qualify for federal financial assistance to administer their Medicaid programs, states must comply with certain federal requirements. *Va. Hosp. Ass'n*, 496 U.S. at 502. For example, the state must establish a plan for reimbursing healthcare providers for the medical services they provide to needy citizens. *Id*.

Prior to November 1, 2011, the Kentucky state cabinet directly reimbursed doctors and hospitals for the services they provided to Medicaid recipients pursuant to a fee schedule set by the state. This is known as a fee-for-service system. *See Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 426 (6th Cir. 2013). In 2011, however, CMS approved Kentucky's application for a waiver that permits the state to administer its Medicaid program as a managed-care program instead of reimbursing providers under the traditional fee-for-service model. (DE 274-2, Glaze Dec. ¶¶ 5, 6.) This was done in an effort to control "ballooning Medicaid costs and resulting pressures on the state's budget." *Appalachian Reg'l*, 714 F.3d at 426.

Under a managed-care program, the Cabinet no longer directly reimburses doctors and hospitals for the healthcare services they provide. Instead, the Cabinet now pays a group of third-party administrators called managed care organizations (MCOs). *Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 5:12-CV-114, 2012 WL 2359439, at * 1 (E.D. Ky. June 20, 2012). The state awards contracts to certain MCOs,

2

which are charged with managing healthcare services for Medicaid beneficiaries who sign up to become "members" of one of the MCOs. *Id.*

The Cabinet pays each MCO a flat monthly fee – called a capitation payment – for the healthcare of each of the MCO's members who is a Medicaid recipient. *Id.* The capitation payment is a set fee that the Cabinet pays for each MCO member, whether or not the member actually receives any health services that month. 42 C.F.R. § 438.2. The MCO then pays the healthcare providers for the healthcare services actually rendered to its members. "So the MCO bears the risk that the costs of care may exceed the capitation payment. But on the other side, it stands to profit if beneficiaries use fewer services." *Appalachian Reg'l*, 714 F.3d at 426.

The state converted to the managed-care model in order to "improve healthcare access and quality by eliminating unnecessary care, enhancing coordination among providers, emphasizing preventative care, and promoting healthy lifestyles." *Id.* The state also believed that the conversion would save it money. *Id.*

The Cabinet initially awarded contracts to three MCOs: Coventry Health and Life Insurance Co., Kentucky Spirit Health Plan, Inc., and WellCare of Kentucky, Inc. *Appalachian Reg'l*, 714 F.3d at 426. The MCOs were charged with administering healthcare in seven of the state's eight Medicaid regions. One of those regions is Region 8 which is made up of 19 counties in eastern and southeastern Kentucky that "are among the most economically depressed, underserved, and medically needy in the Commonwealth." *Id.* at 426-27.

As part of the waiver approval, CMS must approve both the state's contracts with the MCOs and the capitation payments to be paid to the MCOs. 42 C.F.R. §§ 438.6(a),(c), 438.806(c). The capitation payments are set forth in the contracts between the Cabinet and each MCO. CMS reviewed the contracts for compliance with the Medicaid Act and the

applicable regulations. 42 U.S.C. §1396b(m); 42 C.F.R. § 438.806. CMS approved each of the contracts, including the designated capitation rates, for the period of November 1, 2011 to June 30, 2014. (DE 135-3, CMS Letter Oct. 28, 2011; DE 274-2, Glaze Decl. ¶¶ 7-12.) These initial MCO contracts expired on June 30, 2014. (DE 274-2, Glaze Decl. ¶13.)

The MCOs, in turn, contracted with healthcare providers who make up each MCO's healthcare-provider "network." *Appalachian Reg'l*, 2012 WL 2359439, at *1. Each MCO's network must meet certain state and federal standards. These "so-called network-adequacy requirements . . . obligate an MCO to maintain a provider network that guarantees certain services are accessible to its members within specified times or distances from their homes." *Appalachian Reg'l*, 714 F. 3d at 427.

For healthcare services rendered to their members, the MCOs pay healthcare providers who are *in their network* the amount set forth in the contracts between the parties. (DE 278-1, Mem. at 8.) Coventry entered into a temporary agreement with Appalachian Regional, which made Appalachian Regional a provider in Coventry's network. *Id*. The agreement provided that Coventry would pay 107.5 percent of the Medicaid rate for inpatient services. (DE 278-19, Agreement, Ex. A.)

For healthcare services rendered to an MCO's members by healthcare providers who are *not in their network* – out-of-network providers – the amounts paid to providers are governed by other guidelines. For emergency services, federal law prohibits out-of-network providers from charging more than 100 percent of the Medicaid rate. 42 U.S.C. § 1396u-2(b)(2)(D). The MCO agreement between Coventry and the Cabinet provides that "Covered Services shall be reimbursed at 100 percent of the Medicaid fee schedule/rate until January 1, 2012 and after January 1, 2012, at 90% of the Medicaid fee schedule/rate." (DE 54-2, MCO Agreement, § 29.2.) At oral argument, the Cabinet's counsel argued that this provision was intended to establish only a "floor, not a ceiling." (DE 321, Tr. at 74.)

Appalachian Regional operates hospitals and other medical facilities that serve citizens in Region 8. *Appalachian Reg'l*, 714 F.3d at 427. Appalachian Regional's patients are generally sicker than other Medicaid patients, meaning it costs MCOs more to provide healthcare for Appalachian Regional's patients. *Id*. at 428. "Initially, when Coventry was establishing its provider network in Region 8, it was told that it had to include Appalachian in its network to meet Kentucky's network-adequacy standards. Coventry assumed its competitors had to do the same, but it was wrong: the Cabinet did not require Kentucky Spirit to do so." *Id*.

This upset Coventry because having to serve Appalachian Regional's relatively costlier patients was causing Coventry to lose money. *Id*. Coventry believed that a disproportionate number of the sicker Eastern Kentucky population joined Coventry so they could receive in-network healthcare from Appalachian Regional. (DE 302, Resp. at 7.) The capitation rate paid by the state did not cover the medical services these patients incurred. *Appalachian Reg'l*, 714 F.3d at 428. This "meant Coventry was disadvantaged relative to a competitor MCO like Kentucky Spirit that was not required to cover—and pay the higher cost of caring for—Appalachian's sicker patients." *Id*.

The agreement between Coventry and Appalachian Regional provided that it would remain in force until the sooner of the execution of a final agreement or June 30, 2012. (DE 278-20, Amendment, ¶1.) The agreement further provided that either party could terminate it, with or without cause, with 30 days written notice. (DE 278-19, Agreement, ¶17.) By letter dated March 29, 2012, Coventry notified Appalachian Regional that it was

terminating the temporary agreement effective May 4, 2012. *Appalachian Reg'l*, 714 F.3d at 428. (DE 278-1, Mem. at 10; DE 278-22, Termination Letter.)[1]

Appalachian Regional then filed this action, asserting claims against Coventry, the Cabinet, and CMS. (DE 5, First Amended Compl.; DE 135, Second Amended Compl.)

## II. Appalachian Regional's claims against the Cabinet

The only claims at issue on these motions are Appalachian Regional's claims against the Cabinet. This case was initially assigned to the late U.S. District Judge Karl Forester. In a published opinion, Judge Forester determined that Appalachian Regional asserted the following four claims against the Cabinet which are contained in Counts IV through VII of the complaint:

> 1) that Appalachian Regional is the third-party beneficiary of the contract between the Cabinet and Coventry and the Cabinet breached certain provisions of the contract requiring Coventry to both maintain an adequate provider network and to promptly pay providers (Count IV);
> 2) that the Cabinet conspired with Coventry to effect an unconstitutional taking of Appalachian Regional's property by paying Appalachian Regional only 90 percent of the Medicaid rate for emergency medical services provided to Coventry's members (Count V);
> 3) that the Cabinet failed to ensure that Coventry pays Appalachian Regional the reasonable value of the non-emergency healthcare services provided to Coventry's members (Count VI); and
> 4) that the Cabinet breached the provider agreement (Count VII).

*Appalachian Reg'l Healthcare v. Coventry Health and Life Ins. Co.*, 970 F. Supp. 2d 687, 690 (E.D. Ky. Sept. 11, 2013).

---

[1] At oral argument, Coventry's counsel argued that Coventry did not actually terminate the contract but that instead it let the contract expire on June 30, 2012. (DE 321, Tr. at 66-67.) Nevertheless, by letter dated March 29, 2012, Coventry's Executive Vice President Kevin P. Conlin explicitly stated that "pursuant to Section 17 of the Binding Letter of Agreement. . . notice is hereby given of Coventry's decision to terminate the BLOA. The date of termination is May 4, 2012. . . ." (DE 278-22, Termination Letter.) Likewise, in a memorandum, Coventry states, "On March 28, 2012, Kevin Conlin, Executive Vice President of Coventry, sent ARH a notice of termination per the terms of the LOA. . . The effective date of the termination was May 4, 2012. . . ." (DE 278-1, Mem. at 10.)

As will be discussed further below, the Court dismissed **Count IV** (third-party beneficiary) after Appalachian Regional moved to withdraw it. (DE 226, Motion to File Third Amended Compl.; DE 269, Minute Entry; DE 271, Tr. at 9.)

As to the takings claim against the Cabinet set forth in **Count V** involving payment to Appalachian Regional for emergency healthcare services, Judge Forester ruled that any claim for damages against the Cabinet is barred by the doctrine of sovereign immunity *Appalachian Reg'l v. Coventry Health and Life Ins. Co.*, No. 5:12-CV-114, 2014 WL 414244, at *2 (E.D. Ky. Feb. 4, 2014). Judge Forester determined that Appalachian Regional could, however, assert a claim for injunctive relief against the Cabinet, prohibiting it in the future from including provisions in MCO contracts that allow for reimbursing healthcare providers for emergency healthcare services at less than 100 percent of the Medicaid rate. *Id.*

As to the claim against the Cabinet in **Count VI** (quantum meruit) requesting an injunction ordering the Cabinet to ensure that Appalachian Regional is paid the reasonable value of its non-emergency healthcare services, Judge Forester ruled that this Court could not order state officials to comply with *state* law but that it could order the Cabinet to comply with any applicable *federal* law. *Appalachian Reg'l*, 970 F. Supp. 2d at 695.

Judge Forester dismissed **Count VII** (breach of contract against the Cabinet), again finding that any claim for damages against the Cabinet is barred by the doctrine of sovereign immunity. *Appalachian Reg'l*, 2014 WL 414244, at * 2.

Accordingly, it would appear that the sole claims remaining against the Cabinet are the claims for injunctive relief in **Counts V and VI**. With both of these claims, Appalachian Regional asserts that the Cabinet should be ordered to take some action to ensure that Coventry pays it sufficiently for healthcare services rendered to Coventry's Medicaid members. With Count V, Appalachian Regional argues that Coventry failed to pay it

sufficiently for emergency healthcare services. With Count VI, Appalachian Regional argues that Coventry failed to pay it sufficiently for non-emergency healthcare services.

The Cabinet moves for summary judgment in its favor on both of these claims.

**III. Analysis**

The Cabinet argues that both Counts V and VI are based on a provision in the contract between the Cabinet and Coventry regarding payments to Coventry's out-of-network providers. The provision at issue states, "[c]overed Services shall be reimbursed at 100 percent of the Medicaid fee schedule/rate until January 1, 2012 and after January 1, 2012, at 90% of the Medicaid fee schedule/rate." (DE 54-2, MCO Agreement § 29.2.) In its complaint, Appalachian Regional asserts that the 90-percent rate is unconstitutional for emergency healthcare services (Count V) and unreasonable for non-emergency services (Count VI). The Cabinet argues that Counts V and VI should be dismissed because the 90-percent provision in the contract actually protects healthcare providers by establishing a minimum rate that MCOs must pay healthcare providers, not a maximum rate. Further, the Cabinet states that, to prevent any further misunderstandings, it has already removed this provision from its MCO contracts. (DE 280-1, Mem. at 7.)

In its response, Appalachian Regional does not address this portion of the Cabinet's motion for summary judgment. Nor does Appalachian Regional address either Count V or Count VI in its motion for summary judgment. Further, at the hearing on these motions, Appalachian Regional did not address either of these claims against the Cabinet. (DE 321, Tr. at 44-51.) Accordingly, Appalachian Regional has abandoned its claims against the Cabinet in Counts V and VI and the Court will dismiss those claims. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011); *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524–25 (6th Cir. 2006); *Conner v. Hardee's Food Sys., Inc.*, 65 F. App'x 19, 24 (6th Cir. 2003).

The only claim against the Cabinet that Appalachian Regional addresses in its motion for summary judgment and response and the only claim that it addressed at oral argument was a claim that the Cabinet has failed to enforce the so-called network adequacy standards and has instead allowed Coventry to operate without an adequate provider network. Again, the network-adequacy standards "obligate an MCO to maintain a provider network that guarantees certain services are accessible to its members within specified times or distances from their homes." *Appalachian Reg'l*, 714 F.3d at 427.

As both the Cabinet and Coventry argue, however, Appalachian Regional has already voluntarily dismissed this claim. (DE 280-1, Mem. at 8; DE 294, Coventry Resp. at 3, n. 2.) The network-adequacy claim is found in Count IV of the complaint. With that count, Appalachian Regional asserted that "[t]he Cabinet has not imposed intermediate sanctions or taken adequate efforts to enforce its adequate network requirements and has breached its own adequate network duties." (DE 5, Compl. ¶ 117.)

Judge Forester made clear to the parties in the published opinion entered on September 11, 2013 that he construed the complaint to assert four claims against the Cabinet. Only one of those claims involved the network-adequacy standards and that claim was the third-party beneficiary claim in Count IV. *Appalachian Reg'l*, 970 F. Supp. 2d at 690. Judge Forester determined that Appalachian Regional asserted that it was "the third-party beneficiary of the contract between the Cabinet and Coventry, and the Cabinet breached the network adequacy and prompt pay provisions." *Id*. Appalachian Regional never sought to correct that interpretation of the complaint.

After Judge Forester's ruling – and, thus, with full knowledge that Judge Forester had construed the complaint to assert a network-adequacy claim only in Count IV – Appalachian Regional moved to amend its complaint in part to withdraw Count IV. In its motion, Appalachian Regional stated that the proposed amended complaint would

9

"withdraw certain causes of action against Coventry . . . ." (DE 226-1, Mem. at 1.) Its tendered amended complaint explicitly stated that Appalachian Regional was "hereby withdrawing" Counts IV and VIII. (DE 226-2, Tendered Third Amended Compl. ¶ 1.)

While the tendered amended complaint alleged that "Coventry continues to fail to meet network adequacy standards," (DE 226-2, Tendered Third Amended Compl., Count II), Appalachian Regional made clear that the tendered amended complaint made no such claims against the Cabinet. (DE 243, Reply at 1, n.1) Appalachian Regional stated the complaint was "clearly directed against Coventry." (DE 243, Reply at 3.) Appalachian Regional further explained that it was "simply beyond reason" for anyone to think that any of the allegations in the proposed complaint were directed at the Cabinet, noting that the Cabinet was not even "mentioned" in the tendered complaint. (DE 243, Reply at 4.)

Magistrate Judge Atkins denied the motion to amend the pleadings. (DE 255, Order.) With regard to the attempt to withdraw Counts IV and VIII by filing the proposed amended complaint, Judge Atkins stated, "it is not necessary to file an amended complaint in order to withdraw claims." (DE 255, Order, at 2, n.1.)

Later, at a teleconference held on February 25, 2015, the Court explained its understanding that, with the tendered amended complaint, Appalachian Regional sought to withdraw Counts IV and VIII. Appalachian Regional agreed with that assessment. (DE 271, Tr. at 8-9.) The Court explained that Judge Atkins did not allow Appalachian Regional to amend its complaint to dismiss those claims because the Court could simply dismiss the claims without an amended complaint if that is what Appalachian Regional desired. Appalachian Regional stated, "that would be fine" and the Court then dismissed both Counts IV and VIII. (DE 271, Tr. at 9; DE 269, Order.)

Appalachian Regional does not explain where in the complaint it asserts a network-adequacy claim other than in Count IV. Federal Rule of Civil Procedure 8 requires a

10

complaint to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 10 requires that, "if doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." Fed. R. Civ. P. 10(b). "The primary purpose of these rules is to give defendants notice of the claims against them and the grounds supporting the claims." *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011). Appalachian Regional's complaint consists of 35 pages, 149 paragraphs, and 10 separate counts. In order to promote clarity, if Appalachian Regional sought to assert a network-adequacy claim somewhere other than in Count IV, it was required to do so in an eleventh separate count.

In its response to the summary judgment motion, Appalachian Regional argues that its complaint contains extensive factual allegations regarding the network-adequacy requirements. Appalachian Regional also argues that it conducted discovery relevant to network adequacy. Both of these things may be true. The Cabinet does not argue, however, that the complaint did not assert any claim against it for failing to enforce the network-adequacy standards. It argues that the complaint did indeed assert such a claim and that the claim was contained only in Count IV.

Again, with Count IV of the complaint, Appalachian Regional asserted that "[t]he Cabinet has not imposed intermediate sanctions or taken adequate efforts to enforce its adequate network requirements and has breached its own adequate network duties." (DE 5, Compl. ¶ 117.) This is the sole count of the complaint that asserts that the Cabinet failed to enforce the network adequacy standards. Judge Forester made clear to the parties that he interpreted the complaint to assert a network-adequacy claim only in Count IV. In accordance with Appalachian Regional's motion to amend the complaint to withdraw Count IV, the Court has dismissed Appalachian Regional's sole network-adequacy claim against the Cabinet.

11

Furthermore, even if the Court were to find that Appalachian Regional did not withdraw its sole claim alleging that the Cabinet has failed to enforce the network-adequacy requirements, the claim fails because there is no private cause of action under the applicable federal statutes. Again, in accordance with Judge Forester's prior rulings, the only kind of claim that Appalachian Regional can assert against the Cabinet is a claim for injunctive relief requesting an order requiring the Cabinet to comply with *federal* law. *Appalachian Reg'l*, 2014 WL 414244, at *2; *Appalachian Reg'l*, 970 F. Supp. 2d at 695.

As to the federal statutes at issue, in its motion for summary judgment, Appalachian Regional sets forth the text of two federal statues (42 U.S.C. § 1396u-2(b)(5) and 42 U.S.C.A. § 1396u-2(c)(1)(A)(i)) and a federal regulation (42 C.F.R. § 438.206(a), (b)). (DE 279-1, Mem. at 4, 12 n. 48.). In its complaint, it also cites the first of these statutes and the federal regulation. (DE 5, Compl., ¶¶ 15-16.) At the hearing on this matter, Appalachian Regional stated that it sought an order requiring the Cabinet to comply with one of these federal statutes – 42 U.S.C. § 1396u-2(c)(1)(A)(i). (DE 321, Tr. at 85.) Accordingly, the Court assumes that, for any network-adequacy claim not contained in Count IV of the complaint, Appalachian Regional asserts that the Cabinet has violated the two federal statutes and the regulation set forth in its motion for summary judgment.

The first of those statutes requires each MCO to give the state and CMS "adequate assurances (in a time and manner determined by the Secretary)" that it:

> has the capacity to serve the expected enrollment in [its] service area, including assurances that the organization:
>
> > (A) offers an appropriate range of services and access to preventive and primary care services for the population expected to be enrolled in such service area, and
> > (B) maintains a sufficient number, mix, and geographic distribution of providers of services.

42 U.S.C. § 1396u-2(b)(5).

The second statute requires each state to "develop and implement a quality assessment and improvement strategy" that includes:

> Standards for access to care so that covered services are available within reasonable timeframes and in a manner that ensures continuity of care and adequate primary care and specialized services capacity.

42 U.S.C.A. § 1396u-2(c)(1)(A)(i).

Neither of these statutes provides for a direct action by healthcare providers. Accordingly, Appalachian Regional must assert its claim under 42 U.S.C. § 1983. That statute creates a cause of action against any person "who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. Only violations of rights, not laws, give rise to § 1983 actions. *Westside Mothers v. Olszewski*, 454 F.3d 532, 541 (6th Cir. 2006).

In order to confer a right enforceable under 42 U.S.C. § 1983, the statutes must meet the three requirements set forth in *Blessing v. Freestone*, 520 U.S. 329 (1997):

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id*. at 340-41 (citations omitted).

As to the first requirement, "only unambiguously conferred rights, as distinguished from mere benefits or interests, are enforceable under § 1983." *Westside Mothers*, 454 F.3d at 541–42. The question is "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Id*. at 542 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285

13

(2002)). The statute must have "'rights-creating' language that reveals congressional intent to create an individually enforceable right." *Id.* (quoting *Gonzaga Univ.*, 536 U.S. at 287).

In *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015), the Supreme Court expressed its doubt that providers could ever be viewed as the "intended beneficiaries (as opposed to mere incidental beneficiaries)" of the Medicaid program, "which was concluded for the benefit of the infirm whom the providers were to serve, rather than for the benefit of the providers themselves." *Id.* at 1387.

Even if providers could be viewed as the intended beneficiaries of certain provisions of the Medicaid Act, neither of the provisions at issue here unambiguously confers them rights. The statutes here suffer from many of the same deficiencies as the statute at issue in *Armstrong*. There, the providers sued the state alleging that it was reimbursing them at rates lower than what Section 30(A) of the Medicaid Act permits. That provision requires a state Medicaid plan to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396b(i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

42 U.S.C.A. § 1396a(a)(30)(A). The statute further directs that the Secretary *must* approve any plan that meets the requirements set forth in the statute, including those set forth in Section 30(A). 42 U.S.C.A. § 1396a(b).

The Court determined that the providers had no private right of action to enforce Section 30(A), noting that the statute "is phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon beneficiaries of the States' decision to participate in Medicaid." *Id.* at 1387.

14

The two statutes here are also phrased as directives to either the MCO or the state. Neither contains any language conferring a right to sue on healthcare providers. The first statute requires MCOs to assure the state that they offer sufficient services and providers. 42 U.S.C. § 1396u-2(b)(5). The second requires the state to develop standards that ensure that certain healthcare services are available within a reasonable timeframe and in a certain manner. 42 U.S.C.A. § 1396u-2(c)(1)(A)(i).

The second statute does not mention healthcare providers at all. 42 U.S.C.A. § 1396u-2(c)(1)(A)(i). The first does so only in describing the obligations of MCOs to assure the state that its network contains sufficient providers. 42 U.S.C. § 1396u-2(b)(5). The statutes do not focus "on a specific class of beneficiaries." *Westside Mothers*, 454 F.3d at 543 (quoting *Blessing*, 520 U.S. at 343 (internal brackets omitted)). They have "an aggregate focus" on the state's Medicaid program as a whole "rather than an individual focus that would evince congressional intent to confer an individually enforceable right." *Id*. at 542.

Further, any right by healthcare providers to require states to ensure that each MCO's provider network is "adequate" is too "vague and amorphous" for the judiciary to enforce. The "broad and nonspecific language" of the statutes is not suited to judicial remedy. *Id*. at 543.

In *Armstrong*, the Court determined that it was "difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . .care and services.'" *Armstrong*, 135 S. Ct. at 1385. The two federal statutes at issue here involve similarly "judgment-laden" standards. *Id*.

The first statute requires each MCO to assure the state "in a time and manner determined by the Secretary" that its provider network offers an "appropriate range of services and access to preventive and primary care" considering the "population expected to

15

be enrolled" and that its network has a "sufficient number, mix, and geographic distribution" of healthcare providers. 42 U.S.C. § 1396u-2(b)(5). The second statute requires each state to develop standards for healthcare access that ensure healthcare services are available within "reasonable timeframes" and "in a manner that ensures continuity of care and adequate primary care and specialized services capacity." 42 U.S.C.A. § 1396u-2(c)(1)(A)(i). "The interpretation and balancing of these general objectives 'would involve making policy decisions for which this court has little expertise and even less authority.'" *Westside Mothers*, 454 F.3d at 543 (quoting *Sanchez v. Johnson*, 416 F.3d 1051, 1060 (9th Cir. 2005)).

Finally, in determining that Section 30(A) did not confer a private right of action on providers, the Court noted in *Armstrong* that the Medicaid Act provides a single remedy for a state's failure to comply with its requirements – the withholding of federal funds. 135 S. Ct. at 1385, 1387 (citing 42 U.S.C. § 1396c). The Court determined that the provision of a remedy suggested that Congress intended to preclude other means of enforcement. *Id.* That suggestion is equally relevant to the two federal statutes at issue here.

Because neither statute at issue here confers healthcare providers with rights that are enforceable under § 1983, "the federal regulations promulgated pursuant to these statutes are likewise incapable of independently conferring such rights." *Johnson v. City of Detroit*, 446 F.3d 614, 629 (6th Cir. 2006). Moreover, the federal regulation cited by Appalachian Regional does not meet the *Blessing* requirements. In its motion for summary judgment, Appalachian Regional cites subparts (a) and (b) of 42 C.F.R. § 438.206. Subpart (a) requires each state to ensure that all covered services are "available and accessible to enrollees of MCOs . . . in a timely manner." It further requires states to ensure that each MCO provider network meets the network adequacy standards developed by the state. 42 C.F.R. § 438.206(a). Subpart (b) requires the state to ensure, through its MCO contracts,

that each MCO meets certain requirements, including that the MCO "[m]aintains and monitors a network of appropriate providers that is supported by written agreements and is sufficient to provide adequate access to all services covered under the contract for all enrollees, including those with limited English proficiency or physical or mental disabilities." 42 C.F.R. § 438.206(b).

The regulation addresses the states' obligations to ensure that the MCO offers adequate healthcare services. It does not speak in terms of benefits conferred upon healthcare providers. The regulation mentions healthcare providers only in describing the states' obligations to ensure that each MCO has an appropriate provider network. Like the statutes, the regulation focuses on the state's healthcare system in the aggregate, not on individual healthcare providers.

Moreover, the regulatory language is too "vague and amorphous" for the judiciary to enforce. The regulation requires states to ensure that each MCO's healthcare services are available and accessible in a "timely" manner and that each MCO has a network of "appropriate" providers that ensure "adequate" access to all of its healthcare services. These are general objectives that involve making judgment calls and policy decisions that the judiciary does not have the expertise to make.

Citing Judge Forester's September 11, 2013 opinion, Appalachian Regional argues that the Court has already determined that it does have a private right of action under the network-adequacy statutes. With that opinion, however, Judge Forester determined that healthcare providers have a private right of action under the so-called prompt pay provisions of the Medicaid Act. *Appalachian Reg'l*, 970 F. Supp. 2d at 698-700. He did not address whether healthcare providers have a private right of action to enforce the network-adequacy requirements. Furthermore, Judge Forester made that decision without the benefit of the Supreme Court's guidance in *Armstrong*.

17

**IV. Conclusion**

For all these reasons, the Court hereby ORDERS as follows:

1) the Cabinet's motion for summary judgment (DE 280) is GRANTED;

2) the plaintiffs' motion for summary judgment (DE 279) is DENIED;

3) the claims asserted against the Cabinet in Counts V and VI of the complaint are DISMISSED;

4) any claim that the Cabinet has violated 42 U.S.C. § 1396u-2(b)(5), 2 U.S.C.A. §1396u-2(c)(1)(A)(i)) or 42 C.F.R. § 438.206(a), (b) is DISMISSED; and

5) all claims against the Commonwealth of Kentucky, Cabinet for Health and Family Services and Audrey Haynes in her official capacity as Cabinet Secretary having been dismissed, the Court hereby ORDERS that the Commonwealth of Kentucky, Cabinet for Health and Family Services and Audrey Haynes in her official capacity as Cabinet Secretary are DISMISSED as defendants in this action.

Dated September 30, 2016.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY