UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION – LEXINGTON

| | |
|---|---|
| **APPALACHIAN REGIONAL HEALTHCARE, INC., et al.,**<br>    **Plaintiff,**<br><br>V.<br><br>**COVENTRY HEALTH AND LIFE INSURANCE CO.,**<br>**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,**<br>    **Defendants.** | **CIVIL ACTION NO. 5:12-114-KKC**<br><br>**OPINION AND ORDER** |

\*\*\*  \*\*\*  \*\*\*

This matter is before the Court on the plaintiffs' motion for partial summary judgment (DE 276) against defendant Coventry Health and Life Insurance Co.

**I.   Background**

The plaintiffs – referred to collectively as Appalachian Regional – provide healthcare in Kentucky. With their complaint, they challenge certain actions by the state and federal governments and a private managed care organization in the administration of Kentucky's Medicaid program.

The purpose of that program is to provide government funding for medical care of individuals who cannot afford to pay for that care on their own. *Arkansas Dept. of Health and Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). Through the program, the federal government provides funds to help states deliver healthcare to their needy citizens. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990).

The Department of Health and Human Services is the federal agency that administers the program. *Ahlborn*, 547 U.S. at 275. It does so through the Centers for

Medicare and Medicaid Services (CMS). *Id*. The Court will refer to the federal department and CMS collectively as CMS in this opinion. The Kentucky Cabinet for Health and Family Services is the state agency that administers Kentucky's Medicaid program. KRS §§ 194A.010(1), 194A.030(2). CMS and the state cabinet are both defendants in this action.

To qualify for federal financial assistance to administer their Medicaid programs, states must comply with certain federal requirements. *Va. Hosp. Ass'n*, 496 U.S. at 502. For example, the state must establish a plan for reimbursing healthcare providers for the medical services they provide to needy citizens. *Id*.

Prior to November 1, 2011, the Kentucky state cabinet directly reimbursed doctors and hospitals for the services they provided to Medicaid recipients pursuant to a fee schedule set by the state. This is known as a fee-for-service system. *See Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 426 (6th Cir. 2013). In 2011, however, CMS approved Kentucky's application for a waiver that permits the state to administer its Medicaid program as a managed-care program instead of reimbursing providers under the traditional fee-for-service model. (DE 274-2, Glaze Dec. ¶¶ 5, 6.) This was done in an effort to control "ballooning Medicaid costs and resulting pressures on the state's budget." *Appalachian Reg'l*, 714 F.3d at 426.

Under a managed-care program, the Cabinet no longer directly reimburses doctors and hospitals for the healthcare services they provide. Instead, the Cabinet now pays a group of third-party administrators called managed care organizations (MCOs). *Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 5:12-CV-114, 2012 WL 2359439, at * 1 (E.D. Ky. June 20, 2012). The state awards contracts to certain MCOs,

which are charged with managing healthcare services for Medicaid beneficiaries who sign up to become "members" of one of the MCOs. *Id.*

The Cabinet pays each MCO a flat monthly fee – called a capitation payment – for the healthcare of each of the MCO's members who is a Medicaid recipient. *Id.* The capitation payment is a set fee that the Cabinet pays for each MCO member, whether or not the member actually receives any health services that month. 42 C.F.R. § 438.2. The MCO then pays the healthcare providers for the healthcare services actually rendered to its members. "So the MCO bears the risk that the costs of care may exceed the capitation payment. But on the other side, it stands to profit if beneficiaries use fewer services." *Appalachian Reg'l*, 714 F.3d at 426.

The state converted to the managed-care model in order to "improve healthcare access and quality by eliminating unnecessary care, enhancing coordination among providers, emphasizing preventative care, and promoting healthy lifestyles." *Id.* The state also believed that the conversion would save it money. *Id.*

The Cabinet initially awarded contracts to three MCOs: Coventry Health and Life Insurance Co., Kentucky Spirit Health Plan, Inc., and WellCare of Kentucky, Inc. *Appalachian Reg'l*, 714 F.3d at 426. The MCOs were charged with administering healthcare in seven of the state's eight Medicaid regions. One of those regions is Region 8 which is made up of 19 counties in eastern and southeastern Kentucky that "are among the most economically depressed, underserved, and medically needy in the Commonwealth." *Id.* at 426-27.

As part of the waiver approval, CMS must approve both the state's contracts with the MCOs and the capitation payments to be paid to the MCOs. 42 C.F.R. §§ 438.6(a),(c), 438.806(c). The capitation payments are set forth in the contracts between the Cabinet and each MCO. CMS reviewed the contracts for compliance with the Medicaid Act and the

3

applicable regulations. 42 U.S.C. §1396b(m); 42 C.F.R. § 438.806. CMS approved each of the contracts, including the designated capitation rates, for the period of November 1, 2011 to June 30, 2014. (DE 135-3, CMS Letter Oct. 28, 2011; DE 274-2, Glaze Decl. ¶¶ 7-12.) These initial MCO contracts expired on June 30, 2014. (DE 274-2, Glaze Decl. ¶13.)

The MCOs, in turn, contracted with healthcare providers who make up each MCO's healthcare-provider "network." *Appalachian Reg'l*, 2012 WL 2359439, at *1. Each MCO's network must meet certain state and federal standards. These "so-called network-adequacy requirements . . . obligate an MCO to maintain a provider network that guarantees certain services are accessible to its members within specified times or distances from their homes." *Appalachian Reg'l*, 714 F.3d at 427.

For healthcare services rendered to their members, the MCOs pay healthcare providers who are *in their network* the amount set forth in the contracts between the parties. (DE 278-1, Mem. at 8.) Coventry entered into a temporary agreement with Appalachian Regional, which made Appalachian Regional a provider in Coventry's network. *Id*. The agreement provided that Coventry would pay 107.5 percent of the Medicaid rate for inpatient services. (DE 278-19, Agreement, Ex. A.)

For healthcare services rendered to an MCO's members by healthcare providers who are *not in their network* – out-of-network providers – the amounts paid to providers are governed by other guidelines. For emergency services, federal law prohibits out-of-network providers from charging more than 100 percent of the Medicaid rate. 42 U.S.C. § 1396u-2(b)(2)(D). The MCO agreement between Coventry and the Cabinet provides that "Covered Services shall be reimbursed at 100 percent of the Medicaid fee schedule/rate until January 1, 2012 and after January 1, 2012, at 90% of the Medicaid fee schedule/rate." (DE 54-2, MCO Agreement, § 29.2.) At oral argument, the Cabinet's counsel argued that this provision was intended to establish only a "floor, not a ceiling." (DE 321, Tr. at 74.)

4

Appalachian Regional operates hospitals and other medical facilities that serve citizens in Region 8. *Appalachian Reg'l*. 714 F.3d at 427. Appalachian Regional's patients are generally sicker than other Medicaid patients, meaning it costs MCOs more to provide healthcare for Appalachian Regional's patients. *Id*. at 428. "Initially, when Coventry was establishing its provider network in Region 8, it was told that it had to include Appalachian in its network to meet Kentucky's network-adequacy standards. Coventry assumed its competitors had to do the same, but it was wrong: the Cabinet did not require Kentucky Spirit to do so." *Id*.

This upset Coventry because having to serve Appalachian Regional's relatively costlier patients was causing Coventry to lose money. *Id*. Coventry believed that a disproportionate number of the sicker Eastern Kentucky population joined Coventry so they could receive in-network healthcare from Appalachian Regional. (DE 302, Resp. at 7.) The capitation rate paid by the state did not cover the medical services these patients incurred. *Appalachian Reg'l*, 714 F.3d at 428. This "meant Coventry was disadvantaged relative to a competitor MCO like Kentucky Spirit that was not required to cover—and pay the higher cost of caring for—Appalachian's sicker patients." *Id*.

The agreement between Coventry and Appalachian Regional provided that it would remain in force until the sooner of the execution of a final agreement or June 30, 2012. (DE 278-20, Amendment, ¶1.) The agreement further provided that either party could terminate it, with or without cause, with 30 days written notice. (DE 278-19, Agreement, ¶17.) By letter dated March 29, 2012, Coventry notified Appalachian Regional that it was

5

terminating the temporary agreement effective May 4, 2012. *Appalachian Reg'l*, 714 F.3d at 428. (DE 278-1, Mem. at 10; DE 278-22, Termination Letter.)[1]

Appalachian Regional then filed this action, asserting claims against Coventry, the Cabinet, and CMS. (DE 5, First Amended Compl.; DE 135, Second Amended Compl.) The only claim at issue on this motion is Appalachian Regional's "unjust enrichment" claim (Count VI) against Coventry. In later briefs, Appalachian Regional has characterized this claim as one under the doctrine of "quantum meruit." (DE 54, Mem. at 15.) Coventry has also identified this claim as seeking recovery in quantum meruit. (DE 278-1, Mem. at 33-34.) Accordingly, the Court has analyzed this as a claim under the doctrine of quantum meruit, not unjust enrichment.

With this claim, Appalachian Regional asked the Court to declare that it is entitled to the reasonable value of the non-emergency services it provided to Coventry Medicaid members after the contract was terminated.

This case was initially assigned to the late U.S. District Judge Karl Forester. By order dated June 20, 2012, Judge Forester granted Appalachian Regional a preliminary injunction, ordering that the agreement between Coventry and Appalachian Regional would stay in effect until November 1, 2012. *Appalachian Reg'l Healthcare v. Coventry Health and Life Ins. Co.*, No. 5:12-CV-114, 2012 WL 2359439, at *15 (E.D. Ky. June 20, 2012). This meant that Appalachian Regional remained in Coventry's healthcare-provider network

---

[1] At oral argument, Coventry's counsel argued that Coventry did not actually terminate the contract but that instead it let the contract expire on June 30, 2012. (DE 321, Tr. at 66-67.) Nevertheless, by letter dated March 29, 2012, Coventry's Executive Vice President Kevin P. Conlin explicitly stated that "pursuant to Section 17 of the Binding Letter of Agreement. . . notice is hereby given of Coventry's decision to terminate the BLOA. The date of termination is May 4, 2012. . . ." (DE 278-22, Termination Letter.) Likewise, in its memorandum, Coventry states, "On March 28, 2012, Kevin Conlin, Executive Vice President of Coventry, sent ARH a notice of termination per the terms of the LOA. . . The effective date of the termination was May 4, 2012. . . ." (DE 278-1, Mem. at 10.)

6

until November 1, 2012 and Coventry was required to pay Appalachian Regional the contract rates for services until that date.

Accordingly, the remaining question on Appalachian Regional's quantum meruit claim is how much Coventry should have to pay it for non-emergency healthcare services provided *after* November 1, 2012 to Coventry members who are Medicaid beneficiaries. By order dated March 28, 2013, Judge Forester granted Appalachian Regional summary judgment on this claim and ruled that Coventry must pay Appalachian Regional the "reasonable value" of non-emergency healthcare services. *Appalachian Reg'l*, 2013 WL 1314154, at *3-4. Judge Forester declined to determine what that "reasonable value" was, however, finding that any such finding may require an evidentiary hearing and additional discovery. *Id*. (DE 271, Tr. at 7-8.)

Since the injunction expired (and, with it, the contract rate), Coventry has paid Appalachian Regional 90 percent of the Medicaid fee schedule for non-emergency services provided to Coventry members. (DE 302, Resp. at 10.) With its quantum meruit claim, Appalachian Regional asserts that the 90-percent rate is not reasonable.

This motion for partial summary judgment filed by Appalachian Regional deals only with the amounts paid to a certain kind of hospital – those that are licensed as critical access hospitals (CAHs). Congress established the critical-access-hospital license in 1997 in recognition that such hospitals "provide vital services in rural areas and often serve as the foundations of rural health care delivery systems." *Rural Health Resources*, HealthIT.gov (Nov. 18, 2015), https://www.healthit.gov/providers-professionals/benefits-critical-access-hospitals-and-other-small-rural-hospitals. To be licensed as a CAH, among other requirements, a hospital must be located in a rural area and more than 35 miles from another hospital, or have been certified before January 1, 2006 by the state as being a "necessary provider of health care services." *Id*. If a hospital is licensed as a CAH, it is

7

entitled to cost-based reimbursement instead of the standard fixed-rate reimbursement provided to other hospitals. (DE 276-2, CMS Fact Sheet at 2.)

Appalachian Regional owns three CAHs. With this motion, it asks the Court to order that Coventry must pay these particular hospitals at least 101 percent of the hospital's reasonable costs for all out-of-network services provided by the hospitals to Coventry's Medicaid members.

## II. Analysis

In its response, Coventry first argues that Appalachian Regional did not assert any claim for payment to CAHs in its complaint and that it should not be permitted to raise such a claim in a motion for summary judgment. With its quantum meruit claim, however, Appalachian Regional asserts a right to the reasonable value of its health-care services. With this motion, Appalachian Regional asks the Court to declare that, with regard to CAHs in particular, the reasonable value of its services is a minimum of 101 percent of its costs in providing such services. Accordingly, this motion for partial summary judgment simply addresses a particular issue raised by Appalachian Regional's quantum meruit claim.

As to the substance of the issue, a Kentucky statute provides that the Cabinet and any managed care program must provide for reimbursement of services provided to Medicaid recipients in a critical access hospital at rates that are at least equal to the rates Medicare pays such hospitals. KRS § 216.380(13). The contract between Coventry and the Cabinet requires the same. (DE 276-4, MCO Agreement § 29.9.) For both inpatient and outpatient critical access hospital services, Medicare pays CAHs 101 percent of their reasonable costs in providing such services. 42 U.S.C. §1395f(l)(1); 42 C.F.R. §§ 413.70(a)(1), (b)(2)(i); DE 276-2, CMS Fact Sheet, at 2.) Thus, it is clear that Coventry must pay CAHs at least 101 percent of the hospitals' reasonable costs in providing Medicaid services.

In its response, Coventry asserts that 101 percent of the hospital's reasonable costs is equal to 100 percent of the Medicaid fee schedule (DE 295, Resp. at 2). Further, Coventry agrees that "it is required to pay 100% (no more) of the Medicaid fee schedule to CAHs . . . ." (DE 295, Resp. at 3.) In its reply, Appalachian Regional does not dispute that 101 percent of the hospital's reasonable costs is equal to 100 percent of the Medicaid rate. In fact, it states that Coventry's admission that it must pay Appalachian Regional's CAHs 100% of the Medicaid fee schedule should "settle this matter." (DE 306, Reply at 1.)

By separate opinion, the Court has determined that the most that Appalachian Regional is entitled to on its quantum meruit claim for non-emergency healthcare services rendered by it to Coventry's members after the injunction (and thus, contract rate) expired is 100 percent of the Medicaid rate. For *emergency services*, federal law prohibits out-of-network providers from charging more than 100 percent of the Medicaid rate. 42 U.S.C. § 1396u-2(b)(2)(D). Accordingly, the Court will grant Appalachian Regional's motion to the extent that it asks the Court to find that Coventry must pay CAHs 100 percent of the Medicaid rate for healthcare services rendered to Medicaid beneficiaries. The motion will otherwise be denied.

Coventry argues that it has paid Appalachian Regional's CAHs more than 100 percent of the Medicaid fee schedule for the claims at issue and that, therefore, any claim by Appalachian Regional for additional payments to its CAHs should be dismissed. Coventry makes this argument only in its response. It has not made a motion for such relief. Further, in support of this assertion, Coventry cites four pages of the deposition testimony of Appalachian Regional's CEO and an exhibit attached to the deposition. The Court does not find that this evidence proves as a matter of law that Coventry has overpaid Appalachian Regional by $132,220 as it asserts. An overpayment is an affirmative defense and, thus, the burden is on Coventry to prove it.

9

Further, with this motion, Appalachian Regional asks only that the Court order that Coventry pay CAHs a minimum of 101 percent of their reasonable costs (or 100 percent of the Medicaid fee schedule) for services rendered to Medicaid beneficiaries after the contract rate expired. Thus, in this opinion, the Court addresses only whether Appalachian Regional is entitled to that relief.

For all these reasons, the Court hereby ORDERS as follows:

1) Appalachian Regional's motion for partial summary judgment (DE 276) is GRANTED in part and DENIED in part. The motion is GRANTED to the extent that Appalachian Regional asks the Court to order that Coventry must pay Appalachian Regional's critical access hospitals 100 percent of the Medicaid rate for out-of-network hospital services. The motion is otherwise DENIED; and

2) Coventry must pay Appalachian Regional's critical access hospitals 100 percent of the Medicaid rate for out-of-network hospital services rendered to Coventry's Medicaid beneficiaries.

Dated September 30, 2016.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY